Argued and submitted May 7, vacated and remanded in part; otherwise affirmed
June 26, 2003

# STATE OF OREGON,
*Appellant,*

*v.*

# JAMES MARTIN NORRIS,
*Respondent.*

## CF00-0520; A114948

72 P3d 103

Daniel J. Casey, Assistant Attorney General, argued the cause for appellant. With him on the opening brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General. With him on the reply brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Jesse Wm. Barton argued the cause and filed the brief for respondent.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

LANDAU, P. J.

## LANDAU, P. J.

Defendant pleaded guilty to one count of felony fourth-degree assault. At sentencing, the trial court calculated defendant's criminal history score at Level C under the sentencing guidelines and sentenced defendant accordingly. In calculating that criminal history score, the court treated two prior convictions as having merged under the "single judicial proceeding" rule and classified a prior resisting arrest conviction as a "non-person" misdemeanor.

The state appeals, arguing that the trial court erred in calculating defendant's criminal history score. According to the state, under amendments to the sentencing guidelines approved in 1993 and 1995, the single judicial proceeding rule no longer applies and prior convictions for resisting arrest have been reclassified as "person" misdemeanors. Defendant argues that the trial court did not err because the 1993 and 1995 amendments to the sentencing guidelines are void. According to defendant, both sets of amendments, although approved by the legislature, failed to comply with the requirement of Article IV, section 22, of the Oregon Constitution that amendments to any "act" be "published at full length." In this case, defendant argues, the legislature unconstitutionally adopted the amendments to the sentencing guidelines by reference to their citations alone. Defendant concedes that, if the amendments are valid, then the trial court erred in calculating his criminal history score. The state replies that defendant's challenge to the 1993 and 1995 sentencing guidelines amendments is time-barred. In the alternative, the state argues that Article IV, section 22, does not apply because amendments to the sentencing guidelines are not amendments to an "act" within the meaning of the constitution.

We conclude that defendant's challenge to the constitutionality of the sentencing guidelines amendments is not time-barred. Nevertheless, we conclude that the state is correct that Article IV, section 22, does not apply and that the trial court erred in calculating defendant's criminal history score. We therefore vacate defendant's sentence and remand for resentencing.

# I. BACKGROUND

## A. *Felony Sentencing Guidelines Basics*

To understand the issues in this appeal, a bit of context may help. In 1985, the legislature created the Oregon Criminal Justice Council and authorized it to "study and make recommendations on the assessment of risk of future criminal conduct by offenders" for use in, among other things, sentencing. Or Laws 1985, ch 558, § 4. In 1987, the legislature authorized the council to develop "sentencing guidelines" applicable to persons convicted of felonies and other offenses punishable by imprisonment and recommend the guidelines to a newly created State Sentencing Guidelines Board (board), an executive branch administrative agency. Or Laws 1987, ch 619, §§ 2, 4.[1] The legislation further provided:

> "On or before January 1, 1989, and on or before January 1 of each succeeding odd-numbered year, the State Sentencing Guidelines Board shall adopt by majority vote of all its members sentencing guidelines for all offenses punishable by imprisonment in state prisons. The board shall submit the guidelines as adopted, and any amendments which may be adopted from time to time, to the Legislative Assembly at the beginning of each regular session. The guidelines and amendments shall become effective on September 1 following the close of that session unless the Legislative Assembly shall provide a different effective date. The Legislative Assembly may by statute amend, repeal or supplement any of the guidelines."

*Id.* at § 4(1). Thereafter, the board is authorized to adopt amendments to the guidelines. Or Laws 1989, ch 790, § 94a(1). Those amendments, however, "shall not become effective unless approved by the Legislative Assembly by statute." *Id.*

The Criminal Justice Council developed sentencing guidelines and recommended them to the board, and, in

---

[1] In 1995, the duties, functions, and powers of the Criminal Justice Council and the State Sentencing Guidelines Board were consolidated into a single administrative agency, the Oregon Criminal Justice Commission. Or Laws 1995, ch 420, § 6.

December 1988, the board adopted them. *Former* OAR 253-02-001 to 253-13-001. In brief, the guidelines employ a grid system to determine a presumptive sentence. The vertical axis of the grid refers to the seriousness of the current crime. The horizontal axis refers to a criminal history score from A ("multiple (3+) felony person offender") to I ("minor misdemeanor or no criminal record"). The intersection of the two axes determines the presumptive sentence. The sentencing court is then permitted to depart upward or downward depending on the existence of aggravating or mitigating factors.

Calculating a criminal history score requires, among other things, classifying prior convictions as "person" offenses or "non-person" offenses. The original sentencing guidelines approved by the board in 1988 included an exclusive list of offenses that could be regarded as "person" misdemeanors:

> " 'Person Class A misdemeanors' are ORS 163.208 Assault Officer; ORS 163.195 Recklessly Endanger Another; ORS 163.425 Sexual Abuse II; ORS 163.545 Child Neglect; ORS 163.575 Endanger Welfare of Minor; ORS 163.200 Criminal Mistreatment II; ORS 163.160 Assault IV; ORS 166.155 Intimidation II; ORS 163.605 Criminal Defamation; ORS 163.190 Menacing; ORS 488.164 Hit and Run Boat; and all attempted Class C person felonies."

*Former* OAR 253-03-001(14). The list did not include the crime of resisting arrest, ORS 162.315.

The original sentencing guidelines also included a special provision for classifying multiple sentences imposed in a single judicial proceeding:

> "When multiple sentences in a prior single judicial proceeding are imposed concurrently, the defendant shall be considered to have one conviction for criminal history purposes and the crime of conviction having the highest crime seriousness ranking shall be counted in the offender's criminal history. All other convictions, whether sentenced consecutively or concurrently, shall be counted separately in the offender's criminal history."

*Former* OAR 253-04-006(3). That became known as the "single judicial proceeding" rule.

In 1989, the board submitted the guidelines to the legislature, and the legislature approved them:

"The Sixty-fifth Legislative Assembly approves the sentencing guidelines as developed by the State Sentencing Guidelines Board under chapter 619, Oregon Laws 1987[.]"

Or Laws 1989, ch 790, § 87. Although it approved the guidelines, the legislature also directed the board to adopt several amendments. In particular, as pertinent to this case, the legislature required the board to alter several words in the rule regarding calculating an offender's criminal history score:

"The State Sentencing Guidelines Board shall amend, by November 1, 1989, OAR 253-04-006, as filed with the Secretary of State * * * to read:

"* * * * *

"(2)   An offender's criminal history is based upon the number of adult felony and Class A misdemeanor convictions and juvenile adjudications in the offender's criminal history at the time the current crime **or crimes** of conviction [*was committed*] **is sentenced**. Prior adult convictions or juvenile adjudications which have been expunged shall not be considered when classifying an offender's criminal history."

*Id.* at § 98 (boldface indicates new wording; bracketed italics indicate deletions). The 1989 legislature did not order any changes to the wording of subsection (3), concerning the "single judicial proceedings" rule.

Since 1989, the board has adopted additional amendments to the sentencing guidelines and has submitted the amendments to the legislature for approval. Two such amendments are pertinent to this case. First, in 1992, the board adopted amendments to the guidelines that, among other things, entirely deleted the "single judicial proceeding" rule that had been expressed in *former* OAR 253-04-006(3). The board submitted those amendments to the legislature in 1993, and the legislature approved them, declaring, in part, that "[t]he Sixty-seventh Legislative Assembly approves the amendments to OAR * * * 253-04-006[.]" Or Laws 1993, ch 692, § 1(1). The bill in which the 1993 legislature approved

those amendments to the sentencing guidelines did not set out the full text of the rule that was amended.

Second, in 1994, the board adopted amendments that, among other things, added a crime—resisting arrest—to the list of those that may be classified as "person" misdemeanors under *former* OAR 253-03-001(14).[2] In 1995, the board submitted those amendments to the legislature, which approved them, declaring, in part, that "[t]he Sixty-eighth Legislative Assembly approves the amendments to OAR 253-03-001[.]" Or Laws 1995, ch 520, § 1.

B. *Factual Background*

The facts relevant to this appeal are few and undisputed. Defendant was charged by a three-count indictment with two counts of felony fourth-degree assault and one count of harassment based on conduct that occurred on October 28, 2000. Defendant agreed to plead guilty to one of the assault counts, and the state agreed to dismiss the other two counts. The trial court accepted the plea agreement, took the guilty plea as to the one assault count, and dismissed the other two counts.

At sentencing, the state submitted a Criminal History Worksheet that stated that, on February 26, 1991, defendant had been convicted of one count of first-degree robbery and one count of first-degree burglary. The worksheet stated that the two convictions would count as separate person felony convictions in scoring defendant's criminal history. The worksheet also stated that, on April 11, 1991, defendant was convicted of another crime, namely, resisting arrest. The worksheet counted that conviction as a person misdemeanor conviction in scoring defendant's criminal history.

Defendant filed a "Notice of Error in Criminal History." He argued that his robbery and burglary convictions should count as a single felony because, under the sentencing guidelines in effect at the time those crimes were committed, that was the proper treatment of each conviction. In support, he cited the "single judicial proceeding" rule of

---

[2] *Former* OAR 253-03-001(14) went through several renumberings, and, in 1995, was numbered as OAR 213-03-001(15).

*former* OAR 253-04-006(3). According to defendant, the sentences for his robbery and burglary convictions were entered concurrently in a single proceeding, and so must be considered to be a single conviction. Similarly, he argued that his conviction for resisting arrest should count as a nonperson misdemeanor because, under *former* OAR 253-03-001(14), that is how the sentencing guidelines classified the conviction. Applying those rules, defendant argued, would result in a criminal history score of C.

The state argued that those rules no longer apply because both have been amended. In 1993, the state noted, the legislature approved amendments to the sentencing guidelines that repealed the "single judicial proceeding" rule embodied in *former* OAR 253-04-006(3). And, in 1995, the guidelines were further amended to alter the person misdemeanor rule, *former* OAR 253-03-001(14), to add, among other things, the crime of resisting arrest. Applying those amendments, the state argued, would result in a criminal history score of A.

Defendant acknowledged that both of the rules on which he relied had been amended in 1993 and 1995 and that, if those amendments apply, the worksheet correctly calculated his criminal history score. He argued that the amendments could not apply to his 1991 convictions, however, without running afoul of the constitutional prohibition on *ex post facto* laws. He filed a supplemental memorandum, in which he further argued that the 1993 and 1995 amendments to the sentencing guidelines could not be applied to him because they were adopted without complying with the publication requirement of Article IV, section 22.

The trial court rejected defendant's Article IV, section 22, argument, but it accepted the argument based on the constitutional prohibition on *ex post facto* laws. The court then applied the rules in effect in 1991 and calculated defendant's criminal history score as C.

## II. DISPOSITION OF THE MERITS

On appeal, the state argues that the trial court erred in calculating defendant's criminal history score. The state argues that the court should have applied the sentencing

guidelines in effect at the time of the current offense. Under those rules, the single judicial proceeding rule would not apply, and the crime of resisting arrest would count as a person misdemeanor. As a result, the state argues, the proper criminal history score would be A.

Defendant argues that the trial court correctly calculated his criminal history score as C. He expressly abandons his *ex post facto* argument in light of our decision in *State v. Hurd*, 182 Or App 361, 49 P3d 107, *rev den*, 335 Or 104 (2002), in which we rejected a contention essentially identical to the one that he advanced at trial. Instead, defendant relies on his argument that the 1993 and 1995 amendments to the sentencing guidelines cannot apply because they were adopted in violation of Article IV, section 22.

The state advances two contentions in reply: (1) defendant's constitutional challenge is time-barred; and (2) even if not time-barred, defendant's Article IV, section 22, challenge fails because that section does not apply to amendments to administrative rules such as the sentencing guidelines.

A. *Whether Defendant's Constitutional Challenge is Time-Barred*

The first issue is whether defendant's Article IV, section 22, challenge is timely. According to the state, "[w]hen, as here, a challenge is to *how* a statute was enacted and not to the substance of that statute, this court should cautiously exercise its discretion to consider those challenges." The state suggests that, although "[t]here is no clear test for how this court should make its determination," three factors should be taken into account: (1) whether the challenge could have been raised earlier; (2) the amount of time that has passed since enactment; and (3) the amount and type of reliance that has been placed on the assumption that the statute was validly enacted.

The state's argument assumes that the courts have some measure of "discretion" to refuse to entertain a constitutional challenge to a statute on timeliness grounds. The state does not explain the source of that discretion. It does mention that courts in some other states have invoked the

equitable principle of laches as the basis for turning away a challenge to the constitutionality of a statute. *See, e.g., Citizens for Resp. Gov. v. Kitsap Cty.*, 52 Wash App 236, 239-41, 758 P2d 1009 (1988) (laches bars a challenge to a three-year-old ordinance that was not enacted in compliance with constitutional procedures).

We fail to understand, however, how—at least under Oregon law—laches could authorize a rejection of constitutional challenges such as the one defendant asserts in this case. Laches is an equitable doctrine that is predicated on the unfairness of permitting a party to delay in bringing an action when that party knows of all relevant facts and, as a result of the delay, substantially prejudices others in the process. *See generally Menard and Menard*, 180 Or App 181, 185, 42 P3d 359 (2002) (citing *Stephan v. Equitable S & L Assn.*, 268 Or 544, 569, 522 P2d 478 (1974)). In this case, the state is not contending that defendant has unreasonably delayed in asserting his Article IV, section 22, claim.

Indeed, defendant could not lawfully have asserted such a claim any earlier than he did. He would have lacked statutory standing to assert such a claim under the Declaratory Judgments Act, ORS 28.080, because that statute requires that the party seeking a declaration have an interest beyond establishing the mere unlawfulness of an enactment. *See, e.g., Eacret et ux v. Holmes*, 215 Or 121, 125, 333 P2d 741 (1958) ("There is no case for declaratory relief where the plaintiff seeks merely to vindicate a public right to have the laws of the state properly enforced and administered.") (internal quotation marks omitted). Not until defendant was convicted of a crime to which the 1993 and 1995 amendments to the sentencing guidelines applied could he have asserted his challenge to the constitutionality of those amendments. *Id.* Defendant's challenge, thus, is timely.

The state appears to be arguing that, because *other defendants* conceivably could have asserted the same challenge earlier, *this defendant* should be precluded from doing so now. Why equity should preclude one party from asserting a claim at the earliest possible occasion because someone else did not do so is not apparent to us. Established principles of laches certainly do not require that.

The state also argues that the need to exercise discretion in determining whether to entertain a constitutional challenge derives from the "enduring judicial recognition that finality and stability" are important to our society. No one would contest the validity of the assertion that finality and stability are important values. That said, it still remains unexplained why it means that the courts may refuse even to hear an otherwise potentially meritorious constitutional challenge. By parity of reasoning, *Plessy v. Ferguson*, 163 US 537, 16 S Ct 1138, 41 L Ed 256 (1896), *overruled by Brown v. Board of Education*, 347 US 483, 494-95, 74 S Ct 686, 98 L Ed 873 (1954), would still be the law of the land.

The state insists that we possess the discretion to refuse to hear only a "procedural" constitutional challenge, as opposed to a "substantive" challenge. The state does not explain, however, what makes a challenge "substantive" as opposed to "procedural." *Cf. Kusyk v. Water Resources Dept.*, 164 Or App 738, 744, 994 P2d 798 (2000) ("We have also avoided characterizing what constitutes a vindication of someone's rights by merely labeling whether a judgment is a 'procedural' or 'substantive' victory."); *State v. George*, 127 Or App 581, 585-56, 873 P2d 468, *rev den*, 319 Or 274 (1994) ("labels such as 'substantive' or 'procedural' provided little assistance" in determining whether a statute is retroactive) (citing *Rhodes v. Eckelman*, 302 Or 245, 249, 728 P2d 527 (1986)).

Aside from that, we are troubled by the state's suggestion that there are some constitutional challenges that apparently are more important (substantive) than others (procedural). All of the limitations on government authority that are expressed in our constitution are included for presumably important reasons. We are aware of no principle by which we may assay that some of those reasons are more or less compelling than others. Indeed, the state's argument seems rather at odds with the foundational principle of Oregon constitutionalism that the courts of this state recognize no hierarchy of constitutional rights that may be balanced against one another. As the Supreme Court explained in *Libertarian Party of Oregon v. Roberts*, 305 Or 238, 246, 750 P2d 1147 (1988):

"A court * * * cannot divine the relative importance of interests absent reference to the constitution itself; it is in the constitution that competing interests are balanced. A court's proper function is not to balance interests but to determine what the specific provisions of the constitution require and to apply those requirements to the case before it."

Even if the state were correct that we may exercise our discretion to refuse to entertain an Article IV, section 22, challenge, the three factors that the state suggests that we apply do not weigh in favor of such a refusal in this case.

First, as to whether the challenge could have been raised earlier, we have already noted that defendant is raising the challenge at the earliest possible occasion; in no reasonable sense may it be said that this defendant has slept on his rights.

Second, as to the amount of time that has passed, we note that eight years passed from the time of the adoption of the 1993 sentencing guidelines amendments to defendant's sentencing and six years from the time of the adoption of the 1995 amendments to the same sentencing. That does not appear to us to be an unreasonable amount of time. Even the state acknowledges that the amount of time is relatively short.

Third, concerning the extent of reliance, the state asserts that, "undoubtedly," many people have relied on the presumptive validity of the amendments. In support of that assertion, the state cites a single decision of this court, in which we merely noted that, after the adoption of the 1993 sentencing guidelines amendments, the single judicial proceeding rule is "no longer part of the guidelines." *State v. Westcott*, 139 Or App 374, 377 n 2, 912 P2d 400, *rev den*, 323 Or 691 (1996). The state does not explain how the citation to that decision, however, enables us to assess in any meaningful way the extent to which there actually has been reliance on the presumed validity of the sentencing guidelines amendments. We therefore conclude that, even under the state's proposed analysis, defendant's Article IV, section 22, challenge is not untimely.

B. *Whether Article IV, Section 22, Applies*

As we have noted, the state argues that, if defendant's challenge is timely, it still fails, because Article IV, section 22, does not apply to amendments to the sentencing guidelines. According to the state, that constitutional provision applies only to amendments of, or revisions to, "acts." An "act," the state argues, is a legislatively enacted statute. The sentencing guidelines are not statutes but, rather, administrative rules adopted by an executive branch agency, the State Sentencing Guidelines Board.

Defendant argues that Article IV, section 22, applies because the sentencing guidelines in fact are statutes. Defendant observes that, while the sentencing guidelines originally were adopted by an administrative agency, they nevertheless were approved by the legislature and thereby achieved the status of statutory law. Given that the sentencing guidelines are statutes, defendant argues, they may be amended only in accordance with Article IV, section 22.

Whether the sentencing guidelines are an "act" within the meaning of Article IV, section 22, requires us first to determine what the constitution means by the reference to an "act" and then to determine whether the sentencing guidelines are such an "act."

1. *The meaning of "act"*

Because Article IV, section 22, was adopted as part of the original 1859 constitution, in determining the first issue, we are guided by the principles of constitutional interpretation described in *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992). That is, we attempt to ascertain the meaning intended by the framers and by the people who adopted the constitution by examining the relevant wording, the case law surrounding it, and the historical circumstances that led to its creation. *Id.*

In that regard, we pause to note that the state has questioned whether there is a particular sequence to the *Priest* analysis. The answer appears to be no. In cases in which the disputed provision of the constitution was enacted by initiative, there does appear to be a sequence, namely, first, examine the wording of the constitutional provision and proceed to the second and third inquiries only if that wording

is ambiguous. *See generally Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 559, 871 P2d 106 (1994).[3] In cases in which the disputed provision is part of the original 1859 constitution, however, no such sequence applies. In all cases, the wording, the relevant case law, and the historical circumstances must be examined. And the order is not important. Thus, in some cases, the Supreme Court has examined the case law after considering the historical circumstances. *See, e.g., Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 115, 23 P3d 333 (2001). In other cases, the court has examined the case law before considering the historical circumstances. *See, e.g., Lakin v. Senco Products, Inc.*, 329 Or 62, 69-70, 987 P2d 463, *clarified on recons*, 329 Or 369, 987 P2d 476 (1999).[4]

a. The wording of Article IV, section 22

Article IV, section 22, of the Oregon Constitution provides, in part:

"No act shall ever be revised, or amended by mere reference to its title, but the act revised, or section amended shall be set forth, and published at full length."

The provision applies only to a revision of, or amendment to, an "act." Thus, the text makes clear that, if the object of a revision or an amendment is an "act," Article IV, section 22,

---

[3] The court explained that the interpretation of a constitutional amendment adopted by initiative is governed by the same principles that govern the construction of statutes:

"This court applies to the construction of a statute the same method of analysis * * * that it applies to the construction of an initiated constitutional provision. That is, the first level of analysis is to examine .text and context. That level includes subsidiary principles of statutory construction that are relevant to this case. In determining the meaning of the text of a statute, words of common usage that are not defined in the statute typically are to be given their plain, natural, and ordinary meaning. And, the context of a statutory provision includes other provisions of the same statute and other statutes on the same subject. Only if the legislative intent remains unclear after an examination of text and context does the court consider legislative history."

*Ecumenical Ministries*, 318 Or at 560 (citations omitted). In that case, the court determined the meaning of a disputed provision of the constitution that was enacted by initiative. Because it concluded that the meaning was plain from its text, the court declined to consider the history of the provision. That method of analysis drew two separate concurring opinions from Justices Fadeley, *id.* at 575 (Fadeley, J., concurring), and Unis, *id.* at 577-78 (Unis, J., concurring), both of whom objected to the court's failure to address the history of the provision.

[4] Having said that, we note that the state's question is a fair one in light of several Supreme Court cases that describe the *Priest* analysis as a "sequence of analysis." *See, e.g., Smothers*, 332 Or at 115.

applies. But if the legislature approves a revision or an amendment to something other than an "act," that section of the constitution does not apply. The controlling question, therefore, is what the section means by an "act."

Webster's 1828 dictionary defined the term broadly:

> "The result of public deliberation, or the decision of a prince, legislative body, council, court of justice, or magistrate; a decree, edict, law, judgment, resolve, award, determination; as an *act* of parliament, or of congress."

Noah Webster, 1 *An American Dictionary of the English Language* (1828) (emphasis in original).[5] Contemporaneous law dictionaries, however, defined the term slightly more narrowly to refer to statutes. Burrill's law dictionary, for example, defined the term to mean, with respect to legislative acts,

> "a written law, formally ordained or passed by the legislative power of a state, called in England an *act of parliament*, and in the United States an *act of congress*, or of *the legislature*: a statute."

Alexander M. Burrill, 1 *A Law Dictionary and Glossary* 27 (1867) (emphasis in original). Bouvier's law dictionary similarly defined the term to refer to

> "*legislation*, is a statute or law made by a legislative body; as, an act of congress is a law by the Congress of the United States; an act of assembly, is a law made by a legislative assembly."

John Bouvier, 1 *A Law Dictionary, Adapted to the Constitution and Laws of the United States of America, and of the Several States of the American Union* 49 (1839) (emphasis in original). Thus, Webster's definition suggests that the term may be taken broadly to mean that a legislative "act" is essentially any decision of the Legislative Assembly, while Burrill's and Bouvier's definitions suggest a meaning limited to acts that have the effect of law, that is, statutes.

The phrasing of Article IV, section 22, suggests that the framers understood the term in the more limited sense that Burrill and Bouvier employed. It refers to amendments

---

[5] The pages of the 1828 edition are not numbered.

or revisions to acts. Usually, only decisions that have continuing force and effect, *i.e.*, statutes, would be subject to amendment or revision. The context similarly suggests that the section was intended to apply to statutes and not to every decision of the Legislative Assembly. Article IV, section 21, for example, provides that "[e]very act, and joint resolution shall be plainly worded, avoiding as far as practicable the use of technical terms." The provision plainly draws a distinction between acts and resolutions, a common distinction between those decisions of the legislature that have the effect of law, namely statutes, and those that do not. Article IV, section 28, similarly refers to the time that an "act" takes effect, specifying that an act does not take effect until 90 days from the end of the legislative session in which it was enacted, except in the case of an emergency "which emergency shall be declared in the preamble, or in the body of *the law*." (Emphasis added.) Once again, the framers apparently understood the term "act" to be synonymous with an enactment that has legal effect, that is, a statute.

Nothing in the text or context of Article IV, section 22, suggests that, in prohibiting amendments or revisions to an "act" without full publication, the framers intended to include legislative amendments or revisions to an administrative rule promulgated by an executive branch agency. That is hardly surprising, given that the framers were, in all likelihood, unaware that an executive branch agency would have had the authority to promulgate such a rule; courts did not recognize that authority until the 1890s.[6]

b. Relevant case law

Article IV, section 22, has received little recent attention in the appellate court decisions of this state, perhaps because the violation of that provision is relatively easy to avoid. In the early days of the state, however, the Oregon

---

[6] As late as 1892, the United States Supreme Court held that it was unconstitutional for the legislature to delegate its lawmaking authority to an executive branch agency:

"That Congress cannot delegate legislative power * * * is a principle universally recognized as vital to the integrity and maintenance of * * * government ordained by the Constitution."

*Field v. Clark*, 143 US 649, 692, 12 S Ct 495, 36 L Ed 294 (1892).

Legislative Assembly was not so careful. In 1862, for example, the legislature enacted a statute entitled "An act to amend an act entitled 'An act to incorporate the city of Portland.'" The act then proceeded to repeal, by reference to section numbers only, several sections of the original act of incorporation. In *City of Portland v. Stock*, 2 Or 69 (1863), the Oregon Supreme Court declared that the amendatory act violated the publication requirement of Article IV, section 22. The court explained:

> "This section was adopted for good reasons. It has been a custom with our legislatures to amend existing laws by mere reference to their titles, and under that cover, to change words and phrases anywhere in its sections; to insert and strike out sentences; to repeal parts of sections at one session, and at the next to re-repeal and amend until it had become a real task to discover what was the existing statute on many subjects, and without the utmost watchfulness the legislators could not know the extent or effect of proposed amendments."

*Id.* at 71-72.

Similarly, in 1874, the legislature managed to enact an amendatory statute with the following title:

> "An Act to amend an act, entitled 'An Act to amend an act, entitled an act to amend an act, entitled an act relating to assessors, passed January 26, 1854, and an act amendatory thereof, passed January 26, 1855,' approved October 24, 1864; and an act amendatory thereof, approved December 19, 1865."

Or Laws 1874, p 117. The amended statute was not set forth. The session law simply dictated, "That all Acts or parts of Acts inconsistent with this Act are hereby repealed." *Id.* at 118. In *Dolan v. Barnard*, 5 Or 390 (1875), the Supreme Court not surprisingly concluded that the 1874 act ran afoul of Article IV, section 22, explaining that

> "To amend an act is to alter or change some of its provisions, allowing others to stand as valid and existing law; and the evil in legislation, which § 22 of Art. 4 of our Constitution is directed against, is the practice of introducing into, and intermingling with, the provisions of an act, changes or alterations in some of its provisions, in such a manner as to

render it difficult to ascertain, by an inspection of the act amended, to what extent and in what respects the same has been modified by the amendatory act. Hence the legislator is required, by our Constitution, to set out and incorporate in the amendatory act, not only the changes made in the act amended, but the portions thereof not affected by the amendment, in such manner that the syntax and meaning of the law, as amended, will be complete within itself. This is required in order that those who are interested in knowing what the law is may find it out, without prospecting through a labyrinth of words, phrases, and sentences, as found in a long list of acts amendatory of the other, to ascertain what the law is, in force at the time."

*Id.* at 392.

In *Martin v. Gilliam County*, 89 Or 394, 173 P 938 (1918), the legislation at issue was not so egregious; one section of a 1915 statute purported to amend a section of a 1913 statute merely by reference to its section number. The court nevertheless concluded that the omission of the full text of the amended statute was in "direct contravention of [the] plain letter" of Article IV, section 22. *Id.* at 397. Similarly, in *Gaston, Town of, v. Thompson*, 89 Or 412, 174 P 717 (1918), the court held that a specific grant of control over county roads to a certain town was, in effect, an unconstitutional attempt to amend the general statute regarding the incorporation of cities without complying with Article IV, section 22. *Id.* at 420.

Thereafter, the legislature appears to have drafted its bills in a manner designed to avoid encounters with Article IV, section 22. The section has been mentioned—but not applied—in a number of other cases, however.

In *Bird v. The County of Wasco*, 3 Or 282 (1871), for example, the court declared that, while Article IV, section 22, applies to "amendments" or "revisions" to an act, it does not apply to repeals:

"When the legislature seeks to repeal an existing act or to limit its territorial application, it is not necessary to set forth the entire act with the repealing clause, or with the limitations and restrictions affixed thereto. The repeal of a statute can be legally effected by an act properly referring

to the one sought to be repealed, and restrictions and limitations can be placed upon an existing law by an act of the legislature properly designating the one sought to be restricted and limited, and at the same time clearly setting forth the restrictions and limitations."

*Id.* at 285.

In *Warren v. Crosby*, 24 Or 558, 34 P 661 (1893), the plaintiff challenged the constitutionality of a statute that authorized county officers to collect taxes. He argued that, although the act did not purport to amend any other statute, it implicitly amended other statutes, the full text of which were not set forth as required by Article IV, section 22. The court rejected the argument. According to the court, that constitutional provision

"impos[ed] a limitation, not on the power of the legislature to make laws, but upon the mode in which that power should be exercised in the enactment of amendatory or revisory laws. If the act is in itself complete and perfect, and is not amendatory or revisory in its character, it is not interdicted by this provision, although it amends by implication other legislation upon the same subject. Such an act, although it may operate to change or modify prior acts, is not within the mischief designed to be remedied by said section 22. 'Statutes,' says Judge Cooley, 'that amend others by implication are not within this provision, and it is not essential that they even refer to the acts or sections which by implication they amend': Cooley, Constitutional Limitations, 152. Hence an act of the legislature, not amendatory in character, but original in form and complete in itself, exhibiting on its face what the law is to be,—its purpose and scope,—is valid, notwithstanding it may in effect change or modify some other law upon the same subject."

*Id.* at 561-62.[7]

In a 1952 case, a defendant argued that an amendment to the state constitution that, in effect, revived a statute that had been declared unconstitutional was itself unconstitutional because it failed to publish the full text of the statute

---

[7] The court's holding in *Warren* appears to be at odds with its later decision in *Gaston*, which did not mention *Warren*. For our purposes, however, the apparent conflict is not pertinent.

that it purported to revive, in violation of Article IV, section 22. The court made short work of that argument, however, explaining that "[t]he above article obviously refers to the acts of the legislature in enacting laws and has no reference to an amendment to the constitution." *State of Oregon v. Payne*, 195 Or 624, 635, 244 P2d 1025 (1952).

In each case, the court referred to Article IV, section 22, as applying to the amendment of *statutes*, not other decisions of the legislature, such as resolutions, or other forms of law, such as constitutional amendments. In none of the cases did the court suggest that the section applies to amendments to administrative rules.

### c. Historical circumstances

There is no "legislative history" of Article IV, section 22, *per se*. Professor Burton reports that there is no evidence of any amendments or any debates on the provision during the Constitutional Convention of 1857. Claudia Burton, *A Legislative History of the Oregon Constitution of 1857—Part II (Frame of Government: Articles III-VII)*, 39 Will L Rev 245, 306 (2003). As with so many other provisions of the Oregon Constitution, Article IV, section 22, was taken, verbatim, from the 1851 Indiana Constitution.[8] *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857* 472 (Charles H. Carey ed. 1926). The Indiana provision, in turn, appears to have been drawn from the 1845 Louisiana Constitution, which has been reported as the first of its kind.[9] *Stock*, 2 Or at 73.

Although, as we have noted, there is no record of debate or other specific evidence of what the framers intended by the adoption of Article IV, section 22, such limitations on legislative authority were fairly common in mid-nineteenth century constitutions.[10] Moreover, the purposes of

---

[8] Article 4, section 21, of the 1851 Indiana Constitution provided that "No act shall ever be revised or amended by mere reference to its title; but the act revised, or section amended, shall be set forth and published at length."

[9] Article 119 of the Louisiana Constitution of 1845 provided, "No law shall be revived or amended by reference to its title, but in such case, the act revised, or section amended, shall be reenacted and published at full length."

[10] Beginning in the 1830s, state constitutions commonly included procedural restrictions on the enactment of legislation in response to a concern that state

the specific limitation expressed in Article IV, section 22, are well known.

As the Oregon Supreme Court observed in both *Stock* and *Dolan*, a common nineteenth century legislative practice was to adopt amendments by reference to titles or sections without including sufficient text to inform any legislator about the effect of enacting the amendatory law. The problem was especially vexing because few legislatures codified their statutes, making tracking down the laws to be amended something of a challenge. As Cooley explained,

> "The mischief designed to be remedied was the enactment of amendatory statutes in terms so blind that legislators themselves were sometimes deceived in regard to their effects, and the public, from the difficulty in making the necessary examination and comparison, failed to become apprised of the changes made in the laws."

Thomas M. Cooley, *A Treatise on the Constitutional Limitations which Rest upon the Legislative Power of the States of the American Union* 182 (5th ed 1883) (internal quotation marks omitted).

Clearly, the focus of the provision is the amendment of statutes, as opposed to other forms of legislative decision making. As the Indiana Supreme Court explained with respect to the provision from which Article IV, section 22, was taken, "[i]t is scarcely necessary to say that the word 'act'

---

legislatures were becoming increasingly corrupt. *See, e.g.,* Charles C. Binney, *Restrictions upon Local and Special Legislation in State Constitutions* 9 (1894) (state constitutional restrictions on lawmaking process reflected a "belief that legislatures are by nature utterly careless of the public welfare, if not hopelessly corrupt"); Amasa M. Eaton, *Recent State Constitutions*, 6 Harv L Rev 109, 109 (1892) ("One of the most marked features of all [mid-nineteenth century] State constitutions is the distrust shown of the Legislature."). The infamous Yazoo land scandal, for example, involving the Georgia legislature's virtual giveaway of millions of acres of land by means of a bill with a deceptive title, gave rise to the requirement that the subject of a bill be expressed in an accurate title. *See generally* Robert F. Williams, *State Constitutional Limits on Legislative Procedure: Legislative Compliance and Judicial Enforcement*, 17 Publius 91, 92 (Winter 1987); Millard H. Ruud, *"No Law Shall Embrace More Than One Subject,"* 42 Minn L Rev 389, 391-92 (1958). Other state constitutional limitations on legislative authority included requiring all bills to be referred to committees, to be read a certain number of times before enactment, to contain only one subject, to be expressed in plain language, and to amend other laws by full publication of the text of the statute to be amended. *See generally* G. Alan Tarr, *Understanding State Constitutions* 118-21 (1998) (describing history of constitutional restrictions on state legislatures).

alludes to a law previously enacted." *Langdon v. Applegate*, 5 Ind 327, 331 (1854), *overruled by Greencastle Southern Turnpike Co. v. State*, 28 Ind 382 (1867).[11] In short, the text and context of Article IV, section 22, as well as case law construing it and the historical circumstances surrounding its adoption, all suggest that an "act" within the meaning of that provision is a statute.

### 2. *Whether the sentencing guidelines are an "act"*

We turn, then, to the question whether the sentencing guidelines are statutes. If they are, then amendments to them must comply with Article IV, section 22. If they are something other than statutes, the amendments to them do not have to comply with that limitation on legislative enactment authority.

There is no debate that the State Sentencing Guidelines Board adopted the guidelines in 1989 as administrative rules. The sole issue is whether, by "approving" them in 1989, the legislature transformed them into statutes.

As we have noted, defendant argues that the legislative approval of the guidelines had the effect of transforming the guidelines into statutes. In support of that contention, he cites two cases. First, he relies on *State v. Langdon*, 330 Or 72, 74, 999 P2d 1127 (2000), in which the Supreme Court stated that "[a]lthough the sentencing guidelines were created as administrative rules, the legislature approved them in 1989, giving them the authority of statutory law." Second, he relies on our decision in *Layton v. Hall*, 181 Or App 581, 587 n 5, 47 P3d 898 (2002), in which we said essentially the same thing: "Although the sentencing guidelines are administrative rules, they are subject to approval by the legislature and thus are treated as statutory law."

The state argues that, merely because the legislature has approved the guidelines by statute does not mean that the guidelines themselves become statutes. According to the state, the guidelines remain administrative rules,

---

[11] Because *Langdon v. Applegate* was not overruled until after the adoption of the Oregon Constitution, it remains relevant to the construction of Article IV, section 22. *State v. Fugate*, 332 Or 195, 214, 26 P3d 802 (2001).

amendments to which need not satisfy the publication requirement of Article IV, section 22.

Certainly nothing in the text of the 1987 or 1989 legislation suggests that the legislature intended the guidelines themselves to become statutes upon approval by the legislature. The 1987 legislation simply directed the board to "submit the guidelines as adopted" to the legislature in 1989. Or Laws 1987, ch 619, § 4(1). When the board did that in 1989, the legislature responded merely by declaring that "[t]he Sixty-fifth Legislative Assembly approves the sentencing guidelines" that the board had adopted. Or Laws 1989, ch 790, § 87.

Interestingly, the 1989 legislation authorizing the board to adopt the guidelines and requiring it to submit them to the legislature also provided that the legislature may "by statute amend, repeal or supplement any of the amendments." ORS 137.667(2). Thus, the legislature apparently was aware of how to make clear when its actions had the effect of creating a new statute. At best, any amendments "by statute" may themselves be statutes. But the law says nothing about the original guidelines approved by the legislature in 1989 becoming statutes.

Even assuming that there is some ambiguity in the legislature's declaration that it "approves" the guidelines, the legislative history demonstrates that there was no intention to transform those guidelines into statutes.

The sentencing guidelines law that the legislature approved in 1987 originated as House Bill 2715, which was drafted by the Oregon Criminal Justice Council, introduced, referred to the House Judiciary Committee, and thence to a subcommittee. During subcommittee hearings on the bill, Judge John Beatty, Vice-chair of the Oregon Criminal Justice Council, explained its purpose and effect. Among other things, he testified that the council had determined that the legislature could proceed in either of two ways: (1) enact the sentencing guidelines as statutes or (2) merely "approve" them while retaining the authority to amend or repeal them by statute; he explained that the council recommended the latter option. Tape Recording, House Committee on Judiciary, Subcommittee 2, HB 2715, Mar 11, 1987, Tape

237 (statement of Judge John Beatty). In hearings before the Judiciary Committee, Beatty offered the following explanation of the same point:

> "The guidelines can either be submitted to the Legislature as a bill, or be adopted by a legislatively authorized body subject to the power of the Legislature to amend, repeal or supplement them. The Council chose the latter method as preferable because it avoids involving the legislature in the details of guideline construction while leaving it free to amend or reject the guidelines by statute at a time when it has a completed guideline system and proposed collateral changes before it for analysis."

Testimony, House Committee on Judiciary, HB 2715, Apr 2, 1987, Ex D at 6 (statement of Judge John Beatty).[12]

---

[12] The state incorrectly suggests that the legislature required statutory approval of any amendments to the guidelines "to avoid potential 'separation of powers' problems in enacting and amending the guidelines." The portion of the legislative history to which the state refers does not involve the requirement of legislative approval of amendments to the guidelines but, rather, involves an entirely different issue, namely, whether the Oregon Criminal Justice Council could promulgate the guidelines. The problem was that the council consisted of members drawn from each of the three branches of Oregon state government. The Attorney General had suggested that the council's adoption of administrative rules would indeed raise significant separation of powers issues and recommended that the guidelines be adopted by a board consisting exclusively of members of the executive branch, *i.e.*, the State Sentencing Guidelines Board. Letter of Advice dated Feb 6, 1987, to Kathleen Bogan (OP-6075). Thus, Kathleen Bogan, Executive Director of the Oregon Criminal Justice Council, explained to the House Judiciary Committee the need for the creation of the board:

> "The creation of the council in the first place made it obvious that it was going to raise separation of power[s] issues whenever it tried to implement or direct any specific branch of government or several branches of government to do anything because it's comprised of members from all three branches and the members are appointed by the authority of all three branches of government."

Tape Recording, House Committee on Judiciary, Subcommittee 2, HB 2715, Mar 11, 1987, Tape 237 (statement of Kathleen Bogan). As a result, she explained, she had asked the Attorney General for an opinion, and, on the basis of that opinion, the council proceeded with a recommendation to create a separate executive branch agency, the State Sentencing Guidelines Board. *Id.*

Judge Beatty similarly explained that the "two-step" procedure of first authorizing the council to develop the guidelines and then authorizing the board actually to adopt them "is designed to satisfy the separation of powers requirement of the Oregon Constitution, and has been found by the Attorney General to do so." Testimony, House Committee on Judiciary, HB 2715, Mar 31, 1987, Ex D at 4 (statement of Judge John Beatty).

We have identified no suggestion in the legislative history that the *board's* promulgation of sentencing guidelines without subsequent legislative approval poses a separation of powers problem.

As we have noted, in December 1988, the State Sentencing Guidelines Board adopted sentencing guidelines and, the following month, submitted them to the legislature. Senate Bill 1073 was introduced to provide a statutory framework for the implementation of the guidelines. As introduced, it contained no provision for legislative approval of the guidelines. The bill was amended by the Senate Judiciary Committee to express the legislature's approval. During a Senate Judiciary Committee work session on the bill, Committee Chair Joyce Cohen explained that the proposed amendment affirmed the guidelines merely to put the legislature on record as agreeing with them. Tape Recording, Senate Judiciary Committee, SB 1073, Jun 8, 1989, Tape 230, Side A (statement of Sen Cohen). Cohen, in fact, suggested that, if the legislature decided that it did not approve of the rules, it would need to repeal them by statute. *Id.* Hardy Myers, then-chair of the Criminal Justice Council, agreed that, if SB 1073 failed, the guidelines would remain in effect until the legislature repealed them. *Id.* (statement of Hardy Myers).

The text of SB 1073 ultimately was inserted into another bill, HB 2250 (known in the trade as a "gut and stuff"). Consistently with the foregoing understanding, the staff summary of the bill explains that the bill establishes a statutory framework for the implementation of "administrative rules" that were promulgated by the State Sentencing Guidelines Board. In fact, throughout the legislative process, the bill (and its predecessor) referred to the guidelines as "rules." We have encountered not a single suggestion in the legislative history that, by approving the guidelines, the legislature contemplated that it was somehow transforming those administrative rules into statutes.

■ Defendant suggests that, under *Langdon* and *Layton*, notwithstanding what the legislature thought it was doing, the legal effect of the legislature's approval of the guidelines was to convert them into statutes. Defendant does not explain why that is so, however. True, both *Langdon* and *Layton* say that the guidelines have "the authority of statutory law." *Langdon*, 330 Or at 74; *Layton*, 181 Or App at 587 n 5. But that hardly establishes that the guidelines actually *are* statutes for the purposes of Article IV, section 22. Indeed, any valid administrative rule—whether or not approved by

the legislature—has the effect of statutory law. As the Supreme Court explained in *Bronson v. Moonen*, 270 Or 469, 476, 528 P2d 82 (1974): "Administrative rules and regulations are to be regarded as legislative enactments having the same effect as if enacted by the legislature as part of the original statute." *See also Meltebeke v. Bureau of Labor and Industries*, 322 Or 132, 157, 903 P2d 351 (1995) ("The rules have the effect of statutory law."); *Freeman v. Employment Dept.*, 157 Or App 530, 533, 971 P2d 455 (1998) (even assuming that a statute does not apply, the relevant administrative "rule has the effect of law"); *Haskins v. Employment Dept.*, 156 Or App 285, 288, 965 P2d 422 (1998) (administrative rules "have the force of law"); *Atchley v. GTE Metal Erectors*, 149 Or App 581, 586, 945 P2d 557, *rev den*, 326 Or 133 (1997) ("Generally, administrative rules and regulations have the same regulatory force as statutes."); *Georgia-Pacific Corp. v. Kight*, 126 Or App 244, 246, 868 P2d 36 (1994) ("rules are as binding on the agency as if the legislature itself had enacted them").

Merely because the legislature expresses its approval by means of a statute does not transform the object of that approval into a statute. The legislature, for example, may approve certain agency expenditures. *See, e.g.*, ORS 179.105(3); ORS 293.550(6). The approval may be expressed in the form of a statute, but that does not transform the expenditures themselves into statutes. Similarly, the legislature may approve applications for the use of certain water rights. ORS 537.805(4)(a). Again, the approval may be expressed in the form of a statute, but that does not transform the applications themselves into statutes. It stands to reason, therefore, that, merely because the legislature in 1989 declared its approval of the sentencing guidelines by statute, it did not thereby transform the guidelines themselves into statutes. They were promulgated as administrative rules, and administrative rules they remained, notwithstanding the legislature's approval of them. Because the 1989 guidelines were administrative rules, amendments to them are not subject to the publication requirement of Article IV, section 22; rules are not "acts" within the meaning of that provision.

An interesting question arises when the legislature actually amends the guidelines *by statute* and then later

amends by statute that earlier amendment. Arguably, the latter statutory amendment would be required to satisfy the publication requirement of Article IV, section 22. We need not address that issue in this case, however, because neither of the two rules at issue was amended by statute and then amended again.

First, the rule defining which prior convictions are to be classified as "person" misdemeanors, *former* OAR 253-03-001(14), was, as we have noted, approved by the legislature in 1989. The rule thus approved remained just that: an administrative rule. In consequence, when the legislature approved the board's amendments to that rule in 1995, it was not required to comply with the publication requirement of Article IV, section 22.

Second, the "single judicial proceeding" rule reflected in the original guidelines, *former* OAR 253-04-006(3), similarly was approved by the legislature in 1989. It is true that the legislature also required the State Sentencing Guidelines Board to alter slightly the wording of the larger rule in which the single judicial proceeding rule appeared. But requiring the board to alter the wording of the rule was not itself a statutory amendment of the rule. Therefore, when the legislature later approved the repeal of the single judicial proceeding rule in 1995, it was not required to comply with the publication requirement of Article IV, section 22.

Even assuming, for the sake of argument, that the legislature's order to alter the wording of the rule amounted to a statutory amendment of the rule, it does not necessarily follow that the later repeal of that amendment was subject to the publication requirement of Article IV, section 22. That requirement applies only to "amendments" or "revisions" to an act. As we have noted, in *Bird*, the Oregon Supreme Court held that, "[w]hen the legislature seeks to repeal an existing act * * * it is not necessary to set forth the entire act" as otherwise might be required under Article IV, section 22. *Bird*, 3 Or at 285. In this case, the 1995 statute that defendant challenges merely repealed *former* OAR 253-04-006(3). Thus, it was not necessary to comply with Article IV, section 22.

To summarize: Although we reject the state's contention that defendant's Article IV, section 22, challenge to

the 1993 and 1995 amendments to the sentencing guidelines is untimely, we agree with the state that those amendments are not invalid because of a failure to comply with the publication requirement of that constitutional provision. The trial court therefore erred in calculating defendant's criminal history score.

Sentence vacated and remanded for resentencing; otherwise affirmed.