Argued and submitted June 4, petition for writ of habeas corpus in case number S060793 dismissed; rule challenge in case number S060854 dismissed December 12, 2013

CONRAD R. ENGWEILER,
*Plaintiff,*

*v.*

Rob PERSSON,
Superintendent,
Oregon State Correctional Institution,
*Defendant.*

(SC S060793 (Control))

CONRAD R. ENGWEILER,
*Petitioner,*

*v.*

DEPARTMENT OF CORRECTIONS,
*Respondent.*

(CA A152445; SC S060854)

(Cases consolidated for argument and opinion)

316 P3d 264

Andy Simrin, Andy Simrin PC, Portland, argued the cause and filed the briefs for plaintiff/petitioner.

Jeremy Rice, Assistant Attorney General, Salem, argued the cause for defendants/respondents. With him on the brief were Mary H. Williams, Deputy Attorney General, and Anna M. Joyce, Solicitor General.

BREWER, J.

**BREWER, J.**

In these consolidated cases, plaintiff seeks immediate release from prison. In his case against the superintendent of the institution in which he is incarcerated, plaintiff seeks habeas corpus relief on the ground that the Board of Parole and Post-Prison Supervision (the board) has set a release date for him in 2018, but, when sentence reduction credits that he has earned under ORS 421.121 for appropriate institutional behavior (earned-time credits) are taken into account, his release date has passed; therefore, his continued incarceration is unlawful. In his administrative rule challenge, plaintiff argues that, to the extent that certain Department of Corrections (DOC) rules pertaining to the granting of earned-time sentence reductions are construed to exclude him from eligibility for such reductions, they are invalid.[1] For the reasons explained below, we conclude that, although—in light of precedent that this court will follow based on principles of *stare decisis*—plaintiff is entitled to have his term of incarceration reduced by earned-time credits, he is not entitled to habeas corpus relief, because the board has not yet performed its prerelease functions under ORS 144.125. We also conclude that it is unnecessary to address plaintiff's rule challenge. Accordingly, we dismiss plaintiff's petitions in both cases.

## I. BACKGROUND

These cases come to us with a distinctive and complex background. To set the stage for our discussion of the issues before us, we summarize the pertinent history of the extensive litigation between the parties. Plaintiff committed aggravated murder in 1990, when he was 15 years old. He was tried as an adult. He was convicted of that crime, and the trial court sentenced him to life in prison with a 30-year mandatory minimum term of imprisonment under ORS 163.105(1)(c) (1989). Plaintiff appealed, arguing, among other things, that the sentence that the trial court imposed was unlawful because ORS 161.620 (1989) prohibited trial courts from imposing a mandatory minimum

---

[1] Plaintiff's petition for a writ of habeas corpus was filed directly with this court. This court accepted certification of plaintiff's rule challenge under ORS 183.400 from the Court of Appeals.

sentence on any person who had been remanded from the juvenile court and was under 17 years of age when he or she committed the crime on which the remand was based. The Court of Appeals agreed with that argument and vacated the sentence. *State v. Engweiler*, 118 Or App 132, 136, 846 P2d 1163, *rev den*, 317 Or 486 (1993) (*Engweiler I*).[2] In 1994, plaintiff was resentenced to life in prison. In 1999, the board conducted a prison term hearing on plaintiff's behalf, under rules that it had adopted earlier that year, the "Juvenile Aggravated Murder" or so-called "JAM" rules. At the conclusion of that hearing, the board issued an order establishing a 480-month murder review date.

Plaintiff sought judicial review of that order. The Court of Appeals held that the board's order setting the review date was not subject to judicial review, *Engweiler v. Board of Parole*, 197 Or App 43, 103 P3d 1201 (2005) (*Engweiler II*), and this court affirmed that decision. *Engweiler v. Board of Parole*, 340 Or 361, 133 P3d 910 (2006) (*Engweiler III*). Plaintiff next sought a writ of mandamus ordering DOC to accelerate his 480-month review date based on earned-time credits in accordance with ORS 421.121(1). *State ex rel Engweiler v. Cook*, 340 Or 373, 133 P3d 904 (2006) (*Engweiler IV*). In that case, this court stated that the phrase "term of incarceration" in ORS 421.121(1) refers to "the amount of time that an inmate must spend in prison before the inmate is eligible for parole." *Id.* at 380. The court further held that, although the review date amounted to a 480-month "prison term" for plaintiff under the JAM rules, the board had not, at that point, given him a release date

---

[2] Over the years, Oregon appellate courts have issued numerous judicial opinions addressing issues that plaintiff has raised:

1. *State v. Engweiler*, 118 Or App 132, 846 P2d 1163, *rev den*, 317 Or 486, (1993) (*Engweiler I*).

2. *Engweiler v. Board of Parole*, 197 Or App 43, 103 P3d 1201 (2005) (*Engweiler II*).

3. *Engweiler v. Board of Parole*, 340 Or 361, 133 P3d 910 (2006) (*Engweiler III*).

4. *State ex rel Engweiler v. Cook*, 340 Or 373, 133 P3d 904 (2006) (*Engweiler IV*).

5. *Engweiler v. Board of Parole*, 343 Or 536, 175 P3d 408 (2007) (*Engweiler V*).

6. *State ex rel Engweiler v. Powers*, 232 Or App 214, 221 P3d 818 (2009) (*Engweiler VI*).

7. *State ex rel Engweiler v. Felton*, 350 Or 592, 260 P3d 448 (2011) (*Engweiler VII*).

and, therefore, he did not yet have a term of incarceration under ORS 421.121(1) against which earned-time reductions could be credited. *Id.* at 383.

Thereafter, in *Engweiler V*, this court answered certified questions from the United States District Court for Oregon pertaining to the operation and effects of the JAM rules. In doing so, the court observed, as it had earlier in *Engweiler IV*, that, after the adoption of the sentencing guidelines system in 1989, juveniles who commit aggravated murder are "a small class of inmates who continued to receive indeterminate sentences," *Engweiler IV*, 340 Or at 381, and who, under ORS 161.620 (1989), were entitled to parole consideration. *Engweiler V*, 343 Or at 545. However, the court ultimately rejected plaintiff's contention that the prison terms set by the board under the JAM rules were "mandatory minimum sentences" within the meaning of, and therefore prohibited by, ORS 161.620 (1989). *Id.* at 553.

Plaintiff later brought a mandamus action in this court to compel the board to conduct a hearing and establish an initial release date for him under ORS 144.120(1)(a) (1989). In deciding that case, this court reiterated that,

> "in *Engweiler IV*, this court described [plaintiff's] sentence as 'life imprisonment with the possibility of release or parole' and observed that [plaintiff] was in the same position as an inmate serving an indeterminate sentence before the adoption of the guidelines sentencing scheme: The board is responsible for determining the actual duration of his imprisonment."

*Engweiler VII*, 350 Or at 607. The court concluded in *Engweiler VII* that ORS 144.120(1)(a) applied to juveniles convicted of aggravated murder and that it required the board to conduct parole hearings for those juveniles. *Id.* at 621. The court further concluded that the JAM rules requiring juveniles convicted of aggravated murder to undergo an intermediate process before they become eligible for parole consideration exceeded the board's rulemaking authority and were invalid because they were inconsistent with the statutes requiring the board to conduct a parole hearing and set an initial release date for that category of offenders, unless the board declines to do so under ORS 144.120(4). *Id.*

at 627. The court ultimately concluded, however, that plaintiff was not entitled to the remedy of mandamus, because the board had no plain legal duty to set a release date given the terms of ORS 144.120(4), which permitted the board not to set a release date where it was able to explain why it had chosen not to do so. *Id.* at 628-29.

In the wake of this court's decision in *Engweiler VII,* the board set plaintiff's initial parole release date for February 2018. At plaintiff's request, on August 9, 2012, DOC's sentence computation unit calculated his earned-time credit to be 1,929.75 days. According to plaintiff, when added to his credit for time served, that earned time calculation meant that he should have been released from physical custody on July 17, 2012.[3] In essence, plaintiff asserts that his earned-time credits function to advance his initial release date set by the board and that his new release date already has passed, effectively requiring his immediate release. To date, however, plaintiff remains in physical custody at the Oregon State Correctional Institute (OSCI), a facility within DOC.

To press his claim, plaintiff filed both this direct habeas corpus proceeding and this administrative rule challenge under ORS 183.400 against certain rules adopted by DOC. In December 2012, this court issued an order to defendant Persson, the superintendent of OSCI, to show cause why a writ of habeas corpus should not be issued. Defendants filed a response, and the parties' positions, as joined in their briefs, are elaborated in greater detail below.

## II.  DISCUSSION

ORS 421.121 provides, in part:

"(1)   Except as provided in ORS 137.635, each inmate sentenced to the custody of the Department of Corrections for felonies committed on or after November 1, 1989, is eligible for a reduction in the term of incarceration for:

"(a)   Appropriate institutional behavior, as defined by rule of the Department of Corrections[.]"[4]

---

[3] Defendants do not dispute that, if plaintiff is entitled to earned-time credits, his release date has passed.

[4] The current version of ORS 421.121(1) is identical, in substance, to the 1989 version of the statute that was in effect when plaintiff committed his offense.

The first question before us is whether, despite the fact that plaintiff was convicted of aggravated murder and received an indeterminate sentence for that conviction, this court already has authoritatively decided that he is entitled to a reduction in a "term of incarceration" based on appropriate institutional behavior—that is, earned time—under ORS 421.121(1)(a). Plaintiff contends that this court so decided in *Engweiler IV*. Defendants respond that this court's pronouncements on that issue in *Engweiler IV* were *dicta* and that, even if they were part of the holding in that case, they were erroneous and should be disavowed.

As discussed above, in *Engweiler IV*, this court stated that the phrase "term of incarceration" in ORS 421.121(1) refers to "the amount of time that an inmate must spend in prison before the inmate is eligible for parole." 340 Or at 380. Although defendants contend that that statement ought to be treated as *dictum*, for the reasons explained below, we conclude that it was a foundational element of the court's decision in *Engweiler IV* and therefore was part of the holding in that case.

After the board established a 480-month prison term for plaintiff pursuant to the JAM rules, plaintiff sought to compel DOC to credit his earned time against his "term of incarceration" under ORS 421.121(1). *Engweiler IV*, 340 Or at 375. In that case, plaintiff and DOC disputed the meaning of the phrase "term of incarceration" in ORS 421.121(1). The first question presented to this court by plaintiff in *Engweiler IV* was:

"Is an inmate who is serving a life sentence for a crime committed on or after November 1, 1989, eligible for a reduction in his or her 'term of incarceration' pursuant to ORS 421.121(1)?"

In his opening brief, plaintiff first pointed to the text of ORS 421.121(1). After noting that the only exception set out in that provision did not apply to him, plaintiff argued that "the express and unambiguous terms of ORS 421.121(1) make [plaintiff] eligible for a reduction in the term of incarceration for appropriate institutional behavior." Plaintiff then discussed the statutory context of ORS 421.121(1), observing that ORS 421.121(2) also used the phrase "term

of incarceration," while contemporaneously amended ORS 421.120 (1989), which applies to offenses committed before November 1, 1989, instead used the phrase "term of sentence."[5] In a footnote, plaintiff indicated that the legislative history to HB 2250 (1989)—the bill that enacted ORS 421.121—did not discuss any exceptions to ORS 421.121(1), nor did the legislature define the phrase "term of incarceration."

The second question that plaintiff presented to this court in *Engweiler IV* was:

"With respect to an inmate serving a life sentence for a crime committed on or after November 1, 1989, does the phrase 'term of incarceration' in ORS 421.121(1) mean the 'sentence' that was imposed by the trial court, or does it mean the 'prison term' that was established by the [board]?"

Plaintiff argued that the "prison term" imposed by the board was synonymous with "term of incarceration" under ORS 421.121(1). The defendants argued that "term of incarceration," as used in that statute, meant "the incarcerative term that a court can or does impose, and not a term that is set by the Board."

With respect to the first question presented in *Engweiler IV*, this court stated:

"[W]e observe that there is no dispute concerning the following: (1) petitioner was 'sentenced to the custody of the Department of Corrections' for a felony committed after November 1, 1989; (2) ORS 421.121(1) applies to 'each inmate' so sentenced, subject only to an exception not applicable here; (3) ORS 421.121 contains no explicit exception for inmates convicted of any particular crimes, including aggravated murder, for inmates not sentenced under the sentencing guidelines, or for inmates sentenced to life imprisonment; and (4) the phrase 'each inmate * * * *shall be eligible* for a reduction in the term of incarceration' (emphasis added) indicates that DOC's duty to reduce the 'term

---

[5] The 1989 Legislative Assembly amended ORS 421.120 by adding the phrase "and Post-Prison Supervision" to the reference in subsection (2) to "the State Board of Parole," and by adding a new subsection, now codified at ORS 421.120(3), establishing that "[t]he provisions of this section shall apply only to offenders sentenced for felonies committed prior to November 1, 1989." Or Laws 1989, ch 790, § 56.

of incarceration' is mandatory for each inmate who meets the criteria for such reductions elsewhere described in ORS 421.121."

340 Or at 377-78 (emphasis in original). With respect to the second question, this court agreed with plaintiff that the board was responsible for establishing his "term of incarceration." The court held that "term of incarceration" refers to the amount of time that an inmate must spend in prison before the inmate is eligible for parole. 340 Or at 380. However, the court rejected plaintiff's contention that his "prison term" established under the JAM rules constituted a "term of incarceration" under ORS 421.121. 340 Or at 383-84. In reaching that conclusion, the court explained that the 480-month "prison term" meant only that the board would conduct a murder review hearing at the conclusion of that period "and, if [plaintiff] is considered an appropriate candidate, the board will set a release date." *Id.* at 383. The court further concluded that, "if the board does set [plaintiff's] parole release date, it also will have defined his 'term of incarceration.'" *Id.* at 383. Because the board was not a party to *Engweiler IV*, and because plaintiff had confined his mandamus claim "to the theory that he was entitled to have the credits deducted from his next hearing date," the court's construction of "term of incarceration" meant that, at that time, there was not yet any date against which plaintiff's earned time could be credited. *Id.*

Again, the threshold question before us is whether, in light of the court's ultimate conclusion in *Engweiler IV* that plaintiff was not entitled to immediate release, the court's intermediate conclusion that "term of incarceration" under ORS 421.121 refers to "the amount of time that an inmate must spend in prison before the inmate is eligible for parole," bears precedential weight or is *dictum*.

This court may consider itself bound to follow a prior statutory construction as a matter of *stare decisis*. *Farmers Ins. Co. v. Mowry*, 350 Or 686, 695-96, 261 P3d 1 (2011). When the court's prior construction is mere *dictum*, however, it has no such precedential effect. *See, e.g., Mastriano v. Board of Parole*, 342 Or 684, 692 n 8, 159 P3d 1151 (2007) ("This court has declined to treat a prior interpretation of a

statute as authoritative when it is *dictum.*"); *SAIF v. Allen,* 320 Or 192, 204, 881 P2d 773 (1994) (same). *"Dictum"* is short for *"obiter dictum,"* Latin for "something said in passing." *Black's Law Dictionary* 1102 (8th ed 2004). In judicial opinions, it commonly refers to a statement that is not necessary to the court's decision. *See State ex rel Huddleston v. Sawyer,* 324 Or 597, 621 n 19, 932 P2d 1145 (1997) ("[T]hat statement [was] *dictum,* because it was not necessary to the outcome of the case."); *State v. Smith,* 301 Or 681, 696 n 10, 725 P2d 894 (1986) ("[T]he statement is not necessary to the decision in the case and is *dictum.*"). Occasionally, it can be difficult to identify *dictum* in a court's opinion, because nonessential legal analysis and the assertions of immaterial legal propositions can be shrouded by the certitude of the court's views. As Justice Cardozo once said, *"[D]icta* are not always ticketed as such, and one does not recognize them always at a glance." Benjamin N. Cardozo, *The Nature of the Judicial Process* 30 (1921).

In this case, however, the task is not so difficult. Although the ultimate issue in *Engweiler IV* was whether plaintiff was entitled to immediate release from prison, the resolution of that issue depended on two foundational inquiries. As discussed, the first question before this court was whether "an inmate who is serving a life sentence for a crime committed on or after November 1, 1989, [is] eligible for a reduction in his or her 'term of incarceration' pursuant to ORS 421.121(1)." As defendants assert, this court could have answered that question merely by concluding that "the phrase 'term of incarceration' implies some defined period of incarceration ending in some form of release" and that "an order setting a review date is, therefore, not sufficient to create a term of incarceration." However, the ability to avoid fully deciding an issue before it—as sometimes occurs when a court "assumes without deciding" or engages in "even if" analysis—does not require a court to do so at the risk of making *dictum* out of its complete resolution of the issue. In proceeding as it did in *Engweiler IV,* this court decided the issues presented to it in a logical order and manner of analysis, including its determination of the meaning of the disputed phrase in ORS 421.121. Because the court's construction of the phrase "term of incarceration" in *Engweiler IV*

was a predicate for the court's ultimate conclusion, we decline to treat it as *dictum*.[6]

We next consider whether we should follow the decision in *Engweiler IV* in these cases based on the doctrine of *stare decisis*. As noted in *Mowry*, "[s]tability and predictability are important values in the law." 350 Or at 698. Because of the importance of those values, we will not overrule prior decisions "simply because the personal policy preferences of the members of the court may differ from those of our predecessors who decided the earlier case." *Id.* (internal quotation marks omitted). At the same time, this court has an obligation to reach what we regard as a correct interpretation of statutes and rules. Indeed, we are so obliged whether or not the correct interpretation has even been advanced by the parties. *See Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997) (so stating). Particularly when we "failed to apply our usual framework for decision or adequately analyze the controlling issue," we must be open to reconsidering earlier case law. *Mowry*, 350 Or at 698. However, "we begin with the assumption that issues considered in our prior cases are correctly decided." *Id.*

In *Mowry*, this court noted that, depending on the presenting circumstances, various factors can play a role in a court's determination whether to reconsider its decision in a previous case. *Id.* at 693-99. In this case, the parties have advanced several considerations that are germane to our analysis. As noted, defendants argue that this court's analysis of ORS 421.121(1) in *Engweiler IV* was deficient because it did not follow the court's accepted methodology for statutory construction. In particular, defendants assert that, in *Engweiler IV*,

> "this court failed to consider pertinent arguments and failed to apply the correct framework in making its decision. Specifically, this court did not consider several pieces of relevant context, and it failed to apply the correct standard

---

[6] Of course, even if the court's prior construction were *dictum*, that would "not, by itself, mean that it was incorrect and without any force whatsoever. It merely [would mean] that we are not *required* to follow it as precedent. The prior construction, even if *dictum*, could have persuasive force because of the soundness of its reasoning." *Halperin v. Pitts*, 352 Or 482, 494, 287 P3d 1069 (2012) (emphasis in original).

for assessing ambiguity in a statute. As explained above, although the phrase 'term of incarceration' plausibly could refer to a parole release date, that is not the only reasonable interpretation. Consequently, the statute is ambiguous. Because this court failed to acknowledge any ambiguity in the statute, it did not consider legislative history or other construction aids. The history and other interpretation aids confirm DOC's interpretation of ORS 421.121's meaning: earned time credits under that statute do not apply to advance parole release dates set by the board. This court should revisit and reject its prior conclusion to the contrary."

Although defendants are correct in observing that the statutory construction analysis in which this court engaged in *Engweiler IV* was not extensive, it is inaccurate to say that the court did not follow its accepted statutory construction methodology. The parties briefed and argued the case, including the issue at hand, based on their respective analyses of the text and context of ORS 421.121(1), and the court did the same. As always, our goal was to determine the meaning of the statute that the legislature that enacted it most likely intended. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993).

It is true that this court in *Engweiler IV* did not have before it the legislative history that defendants have proffered in this case. It is also true that, based on the statutory construction methodology that the court followed when *Engweiler IV* was decided, this court generally did not consider legislative history unless it had determined that the statute at issue was ambiguous. *See PGE*, 317 Or at 611-12. And it is true that we are no longer constrained from considering legislative history in the absence of a determination that a statute is ambiguous. Thus, in interpreting a statute, the parties may present legislative history to the court, and the court will give it the weight that it deems appropriate. *See State v. Gaines*, 346 Or 160, 165-73, 206 P3d 1042 (2009) (analyzing ORS 174.020). That discretion notwithstanding, this court has emphasized that, in determining the meaning of a statute,

"there is no more persuasive evidence of the intent of the legislature than the words by which the legislature undertook to give expression to its wishes. Only the text of a

statute receives the consideration and approval of a majority of the members of the legislature, as required to have the effect of law. The formal requirements of lawmaking produce the best source from which to discern the legislature's intent, for it is not the intent of the individual legislators that governs, but the intent of the legislature as formally enacted into law[.]"

*Gaines*, 346 Or at 171 (citations and internal quotation marks omitted).

In *Engweiler IV*, the defendants did not assert that ORS 421.121(1) was ambiguous, and the court did not conclude that it was. Neither does it appear that the legislative history that defendants now proffer was provided to this court in *Engweiler IV*. We nevertheless consider it for the sole purpose of determining whether our analysis in that case was sufficiently deficient so as to warrant its reexamination. We conclude that, although the material that defendants have submitted would be germane to a freshly undertaken statutory construction analysis, it does not demonstrate that reexamination of the decision in *Engweiler IV* is appropriate.[7] To explain why, we briefly reiterate the issue at hand. As discussed, plaintiff's claims in *Engweiler IV* and in these cases were and are based on ORS 421.121(1). The issue is whether, under that statute, plaintiff is entitled to have earned-time sentence reduction credits applied to his initial parole release date, because that date fixes his "term of incarceration" under ORS 421.121(1). Defendants argue that the phrase "term of incarceration" is confined to terms imposed by a court, not by the board, and that, in *Engweiler IV*, this court failed to apply the correct standard for resolving ambiguity in the statute.

In particular, defendants note that, in endorsing the bill that would create the sentencing guidelines, the Oregon Criminal Justice Council explained that the "current parole

---

[7] In *Mowry*, this court recognized the challenge that inheres in confining a determination *whether* to reexamine this court's prior construction of a statute to something short of a full-blown reexamination of the prior construction. In particular, the court acknowledged that the "degree" of the error in the earlier case may have played a role, "although impossible to quantify, in our cases." *Mowry*, 350 Or at 693 n 3. We are mindful of the importance of not further blurring that line in this case.

function" would need to be "retained for offenders convicted of Aggravated Murder" because that crime is "excluded from the guidelines system." Senate Judiciary Committee, SB 1073, May 5, 1989, Ex A (statement of Oregon Criminal Justice Council). Second, defendants rely on a bill summary for what would become ORS 421.121(1), in which the council explained that the "new good-time program" provides for a "prison-term reduction for appropriate institutional behavior for all offenders sentenced under the guidelines." Senate Judiciary Committee, SB 1073, June 15, 1989, Ex D at 13. From those materials, defendants reason that ORS 421.121(1) applies only to offenders sentenced by courts under the sentencing guidelines.

Defendants have a point to make, but there is a reasonable competing view. Although it is undisputed that sentencing for aggravated murder is excluded from the sentencing guidelines system, ORS 421.121(1) is expressly conditional on the date of commission of the crime, not on any particular sentencing scheme. The fact that the bill summary confirmed that ORS 421.121(1) applies to court-sentenced offenders under the guidelines system—who undoubtedly constitute the vast majority of inmates to whom the statute applies—does not necessarily mean that it is inapplicable to inmates under the board's parole release authority who committed aggravated murder on or after the relevant date. In short, the material that defendants have proffered does not demonstrate that reexamination of this court's analysis in *Engweiler IV* is appropriate.[8]

As we observed in *Mowry*,

"Stability and predictability are important values in the law; individuals and institutions act in reliance on this court's

---

[8] As a postscript, we note that, after this court decided *Engweiler IV* in 2006, the legislature amended ORS 421.121 in three succeeding legislative sessions. *See* Or Laws 2007, ch 15, § 5; Or Laws 2009, ch 660, §§ 17, 19; Or Laws 2009, ch 623, § 1; Or Laws 2010, ch 2 (1st Special Session), § 3. The holding in *Engweiler IV* remains important, because we generally presume that the legislature enacts statutes in light of existing judicial decisions that have a direct bearing on those statutes. *Mastriano*, 342 Or at 693-96; *Owens v. Maass*, 323 Or 430, 438, 918 P2d 808 (1996). The post-*Engweiler IV* amendments reveal that the legislature changed the statute in ways that did not disturb the holding in *Engweiler IV* that "term of incarceration" includes prison terms that the board is authorized to set for inmates serving an indeterminate life sentence.

decisions, and to frustrate reasonable expectations based on prior decisions creates the potential for uncertainty, confusion and unfairness. Moreover, lower courts depend on consistency in this court's decisions in deciding the myriad cases that come before them."

*Mowry*, 350 Or at 698. In the circumstances here, when balanced against the considerations that defendants invoke,[9] the principles of stability and consistency bear the greater weight in the calculus. Accordingly, although other factors could play a role in the analysis in different circumstances, we decline to revisit our holding in *Engweiler IV*.[10]

We turn, then, to the ultimate issue: Whether plaintiff is entitled to immediate release. As noted, plaintiff's habeas corpus petition proceeds on two premises. First, he contends that earned-time credits should have advanced his initial parole release date that has been set by the board. Second, he asserts that, because that adjusted release date has passed, he is entitled to immediate release. Even though we do not revisit the holding in *Engweiler IV* on which plaintiff's first premise is based, plaintiff's second premise fails, for reasons that we will explain.

ORS 144.245(1) provides that, when the parole board "has set a date on which a prisoner is to be released upon parole, the prisoner shall be released on that date unless the prisoner on that date remains subject to an unexpired minimum term." Notwithstanding that mandatory wording, however, ORS 144.125 also provides that, "[p]rior to the scheduled release of any prisoner on parole *** the [parole board] may *** interview the prisoner" to review the prisoner's suitability for release. ORS 144.125(1). If the board makes certain findings, the board may defer parole release. ORS 144.125(2) - (4).

---

[9] As discussed, defendants rely solely on this court's asserted failure in *Engweiler IV* to follow its accepted statutory construction methodology, including its failure to consider the legislative history that defendants now proffer. Defendants have not identified any other factor for our consideration. *See Mowry*, 350 Or at 700 (noting that the defendant did "not argue that other considerations, such as a change in the legal context or a change in the factual underpinnings" of the challenged decision "support reconsidering and overturning that decision").

[10] Because we adhere to our decision in *Engweiler IV*, we do not address plaintiff's argument that defendant's challenge to our decision in that case is foreclosed by the doctrine of issue preclusion.

Plaintiff contends that the "scheduled release" referred to in ORS 144.125 is the same as the "initial parole release date" set by the board pursuant to ORS 144.120 and that his initial parole release date—as adjusted by the application of earned time credits—has passed. Therefore, he asserts, DOC is required to order his release pursuant to ORS 144.245, and it is too late for the board to defer release under ORS 144.125(2) to (4). Plaintiff is mistaken. As we will explain, although the board has set plaintiff's initial release date in 2018, it has not yet scheduled his physical release from custody, taking into account his earned time credits, and plaintiff, therefore, does not yet have a "scheduled release date."

This court confronted a similar situation in *Janowski v. Board of Parole*, 349 Or 432, 245 P3d 1270 (2010). In that case, the petitioner was sentenced under a former version of ORS 163.105 that required imposition of at least a life sentence with a 30-year minimum prison term on a conviction for aggravated murder. In addition, under that scheme, after serving 20 years of such a term, the offender was entitled to a hearing before the board; if the board found that the offender was likely to be rehabilitated within a reasonable time, it was required to eliminate the 30-year minimum prison term. In *Janowski,* the board held the hearing required by ORS 163.105 (1985), and it found that the petitioner was likely to be rehabilitated within a reasonable time. It entered an order to that effect, but it set his release date at the conclusion of his 30-year mandatory minimum sentence. *Id.* at 436-38. The petitioner challenged the board's decision, arguing that the board's finding had the effect of overriding—and thus eliminating—his 30-year mandatory minimum sentence. This court agreed, ruling that the petitioner's 30-year minimum had effectively been set aside. Because the petitioner then was left with an indeterminate life sentence, this court instructed the board to set his parole release date in accordance with the matrix system that was in effect when he committed his crimes. *Id.* at 445, 453.

By the time that the court issued its opinion, however, the matrix-based initial release date that could be

imposed for the petitioner already had passed. Thus, the petitioner argued that he must be immediately released on parole. In particular, he argued that, under ORS 144.245, when the board "has set a date on which a prisoner is to be released upon parole, the prisoner shall be released on that date" and that, because his matrix-based release date was in the past, it was too late for the board to defer his release under ORS 144.125(1). *Id.* at 456, 459. This court rejected the petitioner's argument and concluded that, even though he had already reached and passed his matrix-based release date, the board still was authorized to conduct an interview and defer his release, if appropriate:

> "ORS 144.125(1) (1985) provides that, 'prior to the scheduled release of any prisoner,' the board may interview the prisoner to determine if any of the statutory grounds for postponement of a parole release date are present. The phrase 'scheduled release' is not defined in the statute or in the applicable regulations. However, the plain and natural meaning of that phrase is the date that the board ultimately schedules for the prisoner's release. Again, in this case, [the petitioner] still is incarcerated; the board has not yet scheduled his release. Once the board sets [the petitioner's] release date, it will have an opportunity to interview him to determine whether any of the grounds for postponement of his release are present."

*Id.* at 459 (emphasis omitted).

This court's resolution of the issue in *Janowski* controls here. ORS 144.125 authorizes the board to conduct its prerelease interview any time before the "scheduled" release of the inmate. In common usage, "schedule" means to "designate to do * * * something at a fixed time in the future." *Webster's* at 2028. Thus, the petitioner's argument in *Janowski*—that because his matrix-based release date had passed, the board had missed its opportunity to conduct a prerelease interview—was incorrect. At the time of this court's decision, the board had not scheduled the petitioner's release. Therefore, the board necessarily would be required to schedule the petitioner's release for a future date and would have an opportunity to conduct its interview before that scheduled date.

Plaintiff's situation is identical. Plaintiff's current scheduled release date is in 2018. Even though the application of earned time credits appears to advance plaintiff's "initial release date" to a date in the past, the board cannot "schedule" his physical release for a date in the past. Thus, plaintiff's physical release necessarily will be scheduled for a future date. And, before that date, the board will have the opportunity to conduct its prerelease interview.

Plaintiff protests that the position of the petitioner in *Janowski* was different in a key way: he committed his crime in 1985, before the sentencing guidelines were adopted and the parole system was replaced with post-prison supervision as the post-incarceration part of a defendant's sentence. Therefore, the petitioner in *Janowski* was subject to the parole regime set out in ORS 144.125. Plaintiff, by contrast, committed his crime in 1990, after the sentencing guidelines were adopted. According to plaintiff, the judgment in his case correctly stated that his release, if any, would be to post-prison supervision. And, he argues, no exit interview is required before release to post-prison supervision. Plaintiff is mistaken.

This court has repeatedly stated that plaintiff's entitlement, if any, to eventual release will be to parole. The court summarized those holdings as follows in *Engweiler VII*:

"[I]n *Engweiler V*, the court also observed, as it had earlier in *Engweiler IV*, that juvenile aggravated murderers are 'a small class of inmates who continued to receive indeterminate sentences,' *Engweiler IV*, 340 Or at 381, and who are entitled to *parole consideration*:

"'ORS 161.620 (1989) trumped [ORS 144.110(2)(b) (1989) and ORS 163.105(1) (1989)] by precluding imposition of the 30-year mandatory minimum sentence otherwise authorized by ORS 163.105(1) (1989) for juveniles who were under age 17 when they committed aggravated murder. Consequently, petitioners must be entitled to the possibility of *parole*.'

"*Engweiler V*, 343 Or at 545[.]

"Finally, in *Engweiler V*, this court observed that when Engweiler committed his crime, 'none of the board's existing rules provided either procedural or substantive

mechanisms to determine whether and when to *parole* juvenile aggravated murderers.' *Id.* at 546.

"Based on the foregoing, to resolve the rule challenge and the mandamus cases, this court must decide two questions with regard to each inmate: To what extent has the legislature granted the board authority to make *parole release* decisions in the case of juvenile aggravated murderers like these inmates? And, if the legislature has granted the board authority to make *parole release* decisions in these cases, what release procedures and criteria did the legislature intend for the board to apply with regard to each inmate?"

350 Or at 607-08 (emphases added).

From the foregoing, it is apparent that a necessary premise of each of this court's previous decisions involving the nature of plaintiff's sentence and his possible release depended on the conclusion that he is serving an indeterminate life sentence subject to the possibility of parole. Plaintiff has offered no persuasive analysis that would support a different understanding of his circumstances, and we perceive none.

The review process prescribed by ORS 144.125 exists to ensure that offenders are not released to parole unless and until the board is satisfied that their release is consistent with community safety. The legislature expressly made the parole scheme and that review process applicable to aggravated murder "regardless of the date of the crime." Or Laws 1989, ch 790, § 28, *compiled as a note after* ORS 144.110 (1989). Aggravated murder is the most serious offense in Oregon criminal law. *State v. Haugen,* 349 Or 174, 203, 243 P3d 31 (2010). It begs reason to conceive that the legislature would deliberately create a system in which—irrespective of their age at the time of their crimes—offenders convicted of aggravated murder would be entitled to parole release without any prior review by the parole board. To the contrary, by expressly making ORS 144.125 applicable to aggravated murder, the legislature demonstrated the opposite intent.

In sum, we conclude that the board is authorized to "schedule" plaintiff's release for a future date and to conduct a prerelease hearing under ORS 144.125, notwithstanding

that plaintiff's matrix-based release date, as modified by earned-time sentence reductions, already may have passed. Therefore, plaintiff is not entitled to immediate release.[11]

We turn briefly to the second case that is before us: plaintiff's rule challenge. Plaintiff challenges certain DOC rules and policies based on ORS 183.400(4)(b), which provides for invalidation of a rule that "[exceeds] the statutory authority of the agency." In his opening brief, plaintiff takes considerable pains to analyze various DOC rules and policies that, according to plaintiff, might permit DOC "to ignore reductions that inmates serving life sentences have earned in their terms of incarceration." We decline to address those challenges for two reasons. First, in nearly all instances, plaintiff does not assert that a rule or policy is facially invalid; rather, he repeatedly suggests that, "to the extent that" a rule or policy could be interpreted to deny him earned time credits, it is invalid. Such arguments are not cognizable in a rule challenge under ORS 183.400, and we decline to address them. *See AFSCME Local 2623 v. Dept. of Corrections*, 315 Or 74, 79, 843 P2d 409 (1992) (ORS 183.400 authorizes only facial challenges to agency rules; "the legality of any particular application of the rules is premature, and not subject to review under ORS 183.400").

Second, our reaffirmation of this court's prior construction of ORS 421.121(1) forecloses any inconsistent future action by defendants in regard to plaintiff that might be based on a contrary interpretation of DOC rules or policies pertaining to earned time credit entitlement. As noted, it appears to be undisputed that plaintiff's adjusted release date under ORS 421.121 has now passed. Thus, unsurprisingly, defendants have not made any separate response to plaintiff's rule challenges; instead, they have focused their efforts on questioning this court's prior construction of ORS 421.121(1) in *Engweiler IV*.[12] Because we have adhered to that prior construction of the statute, DOC's rules pertaining

---

[11] We also note that the board is not a party to these proceedings and that plaintiff has not sought to compel the board to commence the process specified in ORS 144.125. We presume that the board will commence and complete that process with appropriate dispatch following the issuance of this decision.

[12] In their sole reference to plaintiff's rule challenge in their answering brief, defendants describe the issues in the habeas corpus and rule challenge proceedings as "functionally identical."

to earned time credits cannot stand between plaintiff and his release on parole. Defendants do not contend otherwise, and plaintiff has not shown that, in contravention of our construction of ORS 421.121, defendants intend to apply those rules or policies to plaintiff in the ways to which he objects. Rather, as explained above, what now stands between plaintiff and release is the process prescribed by ORS 144.125. Accordingly, we decline to address plaintiff's rule challenge.

The petition for writ of habeas corpus in case number S060793 is dismissed. The rule challenge in case number S060854 is dismissed.