524                    July 2, 2025                    No. 580

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

KYLE COLLEEN BLACK,
*Petitioner,*

*v.*

BOARD OF PAROLE
AND POST-PRISON SUPERVISION,
*Respondent.*

Board of Parole and Post-Prison Supervision
A177739 (Control)

KYLE COLLEEN BLACK,
*Plaintiff-Appellant,*

*v.*

Nichole BROWN,
Superintendent,

Coffee Creek Correctional Facility,
*Defendant-Respondent.*

Washington County Circuit Court
22CV08655; A178929

KYLE COLLEEN BLACK,
*Petitioner,*

*v.*

BOARD OF PAROLE
AND POST-PRISON SUPERVISION,
*Respondent.*

Board of Parole and Post-Prison Supervision
A181213

Eric Butterfield, Judge. (Appellate No. A178929)

Argued and submitted on September 30, 2024.

Alexander Coven argued the cause and filed the briefs for appellant/petitioner. Also on the briefs was Oregon Justice Resource Center.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondents. Also on the brief were Ellen F.

Rosenblum, Attorney General and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Egan, Judge, and Joyce, Judge.

AOYAGI, P. J.

In Case No. A181213, reversed and remanded. In Case Nos. A177739 and A178929, affirmed.

**AOYAGI, P. J.**

In this consolidated appeal, petitioner, who was imprisoned for over 25 years for aggravated murder, challenges three separate orders or judgments relating to her release. First, she seeks judicial review of an order of the Board of Parole and Post-Prison Supervision that set April 12, 2022, as her release date on the aggravated-murder sentence, raising an argument regarding her earned-time credits under ORS 421.121 (1995).[1] Second, petitioner appeals a circuit court judgment dismissing her petition for a writ of habeas corpus. She contends that the Department of Corrections (DOC) was responsible for setting her release date and set it incorrectly due to misapplication of her earned-time credits. Third, petitioner seeks judicial review of a board order that released her from prison onto parole instead of post-prison supervision (PPS).

Regarding the earned-time issues, we agree with respondents that it was the board, not DOC, that was responsible for setting petitioner's physical and legal release dates, such that petitioner's challenge to how her earned-time credits were applied is properly directed toward the board. However, because petitioner did not seek judicial review of the board order applying her earned-time credits, instead seeking review of an earlier order, we are ultimately unable to address the board's handling of the earned-time credits. As for the final issue, we agree with petitioner that the board erred in releasing her to parole rather than PPS.

## I.   FACTS

In 1996, petitioner pleaded guilty to aggravated murder. She was sentenced to life in prison, with a minimum 30-year term of incarceration and lifetime PPS. *See* ORS 163.105(1)(c) (1995)[2] (requiring that a person convicted of aggravated murder and sentenced to life imprisonment

---

[1] ORS 421.121 has been amended numerous times since 1995. *See* Or Laws 2007, ch 15, § 5; Or Laws 2009, ch 660, §§ 17, 19; Or Laws 2009, ch 623, § 1; Or Laws 2010, ch 2, §§ 1, 3; Or Laws 2015, ch 625, § 1; Or Laws 2019, ch 635, § 25; Or Laws 2019, ch 213, § 67.

[2] ORS 163.105 has been amended numerous times since 1995. *See* Or Laws 1999, ch 59, § 31; Or Laws 1999, ch 782, § 5; Or Laws 2007, ch 717, § 1; Or Laws 2009, ch 660, § 6; Or Laws 2015, ch 820, § 45; Or Laws 2019, ch 634, § 27.

be ordered "confined for a minimum of 30 years without possibility of parole, release on work release or any form of temporary leave or employment at a forest or work camp"). In a separate case, she was convicted of two counts of aggravated first-degree theft and, on each count, sentenced to 12 months in prison, running consecutively to the other sentences, and 24 months of PPS.[3]

On August 4, 2021, the board held a murder-review hearing and found that petitioner was likely to be rehabilitated within a reasonable time. *See* ORS 163.105(2) (1995) (providing for the board to hold a hearing "[a]t any time after 25 years from the date of imposition of a minimum period of confinement pursuant to subsection (1)(c)," to determine "if the prisoner is likely to be rehabilitated within a reasonable period of time"). In Board Action Form 2 (BAF 2), the board converted petitioner's life sentence to a sentence of life with the possibility of parole, set petitioner's prison term, and provided a projected release date. *See* ORS 163.105(3) (1995) (providing for such an order when the board unanimously "finds that the prisoner is capable of rehabilitation and that the terms of the prisoner's confinement should be changed to life imprisonment with the possibility of parole, or work release").

Regarding petitioner's prison term, the board employed a matrix system that yielded a range of possible prison term lengths. *See Severy v. Board of Parole*, 274 Or App 330, 333 n 1, 360 P3d 682 (2015), *rev den*, 359 Or 667 (2016) (explaining that, where a trial court imposed an indeterminate sentence, the board assigns a "matrix range" and then sets the length of the person's term of incarceration based on that range). Petitioner's matrix range was 168 to 228 months. Because a prison term in that range would have resulted in a release date years in the past, the board instead set petitioner's prison term at 309 months, which would allow time for an "exit interview" before release. *See* ORS 144.125 (1995), *amended by* Or Laws 1999, ch 141, § 1; Or Laws 2009, ch 660, § 3 (at an exit interview, the board

---

[3] In October 2022, the sentencing judgment was amended to run petitioner's theft sentences concurrently with each other and the aggravated-murder sentence, resulting in her immediate release. That event is irrelevant to the issues on appeal in this case.

considers statutorily specified bases for postponement of a person's release date, such as the person having engaged in "serious misconduct during confinement" or having "a mental or emotional disturbance, deficiency, condition or disorder predisposing [them] to the commission of a crime to a degree rendering the prisoner a danger to the health or safety of the community"). With a 309-month prison term, petitioner was given a projected release date of April 12, 2022, and her exit interview was scheduled for January 5, 2022.

In response to BAF 2, petitioner filed a request for administrative review, challenging her prison term and projected release date as not accounting for her statutory earned-time credits. *See* ORS 421.121 (1995) (allowing up to a 20 percent reduction of a person's incarceration term for "appropriate institutional behavior"). She argued that, with earned-time credits, her release date on her aggravated-murder sentence should have been effective August 10, 2021 (*i.e.*, the date that the board issued BAF 2).

About 10 days after petitioner filed her administrative review request, DOC calculated petitioner's earned-time credits and sent a memorandum to the board. Using petitioner's "Current Projected Parole Release Date" of April 12, 2022, DOC calculated petitioner's "Estimated Projected Earned Date" as March 28, 2017—a date nearly five years in the past. DOC noted that it did not intend to release petitioner based on its calculation, because DOC "cannot release the inmate without authorization from the [board]."

On November 3, 2021, the board issued Administrative Review Response 2 (ARR 2). The board denied any relief on BAF 2, reasoning that petitioner's complaint was "outside the scope of [BAF 2]," because it was really aimed at DOC's failure "to timely apply earned time credit," rather than with BAF 2 itself. Petitioner seeks judicial review of that order in appellate case number A177739.

While the board was pointing the finger at DOC, DOC was pointing the finger at the board. In addition to challenging BAF 2, petitioner had also filed a grievance with DOC for failing to release her immediately upon calculating

her earned time. DOC denied relief, explaining that the board takes DOC's earned-time calculation "into consideration when making [its] final determination" but that it is ultimately the board, not DOC, that sets the release date. DOC reiterated that position on administrative appeal of its decision on the grievance:

> "This projected earned date does not result in an [adult in custody's] release, it simply notifies the [board] when their exit interview could be held. The authorization for release and the parole release date on the LIFE sentence is still determined by the [board]; OAR 291-097-0236(1)(d)(B).
>
> "When the calculation of the projected earned date results in a date in the past for a LIFE sentence, it does not indicate this sentence is complete and it does not make a person eligible for an immediate release. [ORS] 163.105(2) (1995) states the [board] has the authority to set a release date."

Meanwhile, petitioner had her exit interview on January 5, 2022, after which the board issued Board Action Form 3 (BAF 3). The board found no reason to defer petitioner's release date and, considering DOC's earned-time calculation, adjusted petitioner's parole release date to January 5, 2022, *i.e.*, the date of the exit interview. The board stated that it could not set a release date earlier than the exit interview date. Petitioner did not seek judicial review of BAF 3.

Although she had finished serving her aggravated-murder sentence at that point, petitioner remained in prison serving her two consecutive 12-month sentences for aggravated first-degree theft. Petitioner filed a petition for a writ of habeas corpus in the Washington County Circuit Court, seeking immediate release. She alleged that DOC was wrongfully imprisoning her, having misapplied the earned-time credits for her murder sentence and thus delayed starting the clock on her theft sentences, and had denied her due process. In petitioner's view, DOC should have used March 28, 2017, as her release date on her murder sentence, regardless of the release date set by the board. The superintendent moved to deny the petition for failure to state a claim, arguing that the board was responsible for setting petitioner's release date, not DOC. The trial court agreed and denied

the petition. Petitioner appeals the resulting judgment in appellate case number A178929.

Petitioner finished serving her theft sentences in October 2022 and was released from prison. Upon her release, the board issued an order of supervision conditions, placing petitioner on lifetime parole. Petitioner sought administrative review, arguing that she should have been released to PPS instead of parole. The board denied relief in Administrative Review Response 4 (ARR 4), stating:

> "An offender convicted of aggravated murder is subject to parole release conditions and supervision, without regard to crime commission date. The Board rejects your contrary argument that the Sentencing Guidelines, or the sentencing court's purported application of the Sentencing Guidelines, divest the Board of its statutory authority to authorize your release on parole.
>
> "Based on your conviction for aggravated murder, the Board properly placed you on life-time parole supervision."

(Citations omitted.) Petitioner seeks judicial review of that order in appellate case number A181213.

## II.   BOARD ORDER SETTING PETITIONER'S RELEASE DATE

We begin with petitioner's challenge to ARR 2, the board order reviewing BAF 2, issued after petitioner's murder-review hearing, in which the board converted petitioner's aggravated-murder sentence and set a projected release date of April 12, 2022.[4] Although her petition for judicial review seeks review only of ARR 2 and not any order issued by DOC, petitioner contends that the board *and* DOC deprived her of the earned-time credits to which she was

_____

[4] Before any appellate briefs were filed, respondents moved to dismiss the two appeals relating to the calculation of petitioner's release date, asserting that petitioner's release from prison rendered them moot. That motion was denied in an unpublished order by our Chief Judge. In their answering brief, respondents again raise mootness, pointing out that petitioner has finished serving PPS on her theft convictions, eliminating one of the two reasons cited in the Chief Judge's order for the appeals not being moot. Meanwhile, after oral argument, petitioner filed an action against respondents in federal court. *See Free Oregon, Inc. v. Oregon Health Authority*, 329 Or App 460, 465 n 5, 541 P3d 897 (2023) (holding that a decision's effect on "current litigation" may be sufficient to avoid mootness). Having fully considered the parties' arguments, we remain unconvinced that the appeals are moot and, therefore, proceed to the merits.

entitled under ORS 421.121 (1995), describing the error as one that "respondents jointly" committed. As we will explain, the mismatch between the subject of petitioner's appeal and the theory underlying her claim of error proves dispositive.

Petitioner makes two alternative arguments as to how her earned-time credits should have been calculated and applied once the board converted her sentence to life with the possibility of parole. Primarily, she argues that, upon the conversion of her sentence from life to life with the possibility of parole, she was subject to a 30-year determinate incarceration term and that respondents should have calculated and applied her earned-time credits based on that determinate sentence. Alternatively, she argues that, when the board converted her sentence and set a 309-month prison term, respondents should have calculated and applied her earned time based on that 309-month term. Of course, DOC did perform its calculation on her 309-month term, but petitioner argues that the board erred when it set her release date on the date of her exit interview in 2022, rather than DOC's calculated earned-time release date in 2017.

Our review is for legal error. *Lehman v. Board of Parole*, 333 Or App 417, 419, 552 P3d 718 (2024), *rev dismissed as improvidently allowed*, unpublished order in case number S071263 (Jan 7, 2025). We apply the substantive law in effect at the time of petitioner's crime. *Barrett v. Board of Parole*, 332 Or App 463, 465 n 1, 549 P3d 12 (2024).

It is undisputed that petitioner engaged in "appropriate institutional behavior" while incarcerated and was therefore entitled to earned-time credits on her aggravated-murder sentence under ORS 421.121 (1995), which provides, in relevant part:

> "(1)   Except as provided in ORS 137.635, each inmate sentenced to the custody of the department for felonies committed on or after November 1, 1989, shall be eligible for a reduction in the term of incarceration for appropriate institutional behavior, as defined by rule of the Department of Corrections, and for participation in the functional literacy program described in ORS 421.084.

"(2)    The maximum amount of time credits earned for appropriate institutional behavior or for participation in the functional literacy program described in ORS 421.084 shall not exceed 20 percent of the total term of incarceration in a Department of Corrections institution."

What is disputed is whether petitioner was entitled to a release date of March 28, 2017, even though that date was in the past, or whether the board was permitted to adjust her release date to April 12, 2022, to bring it into the present and allow time for an exit interview.

In most respects, this case bears a striking similarity to *Lehman*, a case decided after the completion of briefing in this case. The petitioner in *Lehman* was convicted of aggravated murder and second-degree assault in two separate cases. 333 Or App at 419. After a murder-review hearing, the board issued an order converting his life sentence for aggravated murder to life with the possibility of parole and establishing a prison term of 290 months, with a projected release date of October 6, 2019. *Id*. The board held an exit interview on August 15, 2019, and reaffirmed that release date. *Id*. As a result, on October 6, 2019, the petitioner finished serving his aggravated-murder sentence and began serving his consecutive assault sentence. *Id*.

While serving the assault sentence, the petitioner raised the issue of earned time on his aggravated-murder sentence, and DOC sent a memorandum to the board containing DOC's calculation of earned-time credits and a resulting estimated release date of December 20, 2016—a date more than four years in the past at that point. *Id*. at 419-20. With that information in hand, the board issued an order stating that it lacked authority to set a release date for aggravated murder earlier than the date of the exit interview. *Id*. at 420. The board did, however, adjust the release date to the date of the exit interview. *Id*. On administrative review, the petitioner argued that the board was required by statute and administrative rule to grant him his full earned-time credits and, therefore, should have set his aggravated-murder release date for December 20, 2016, which would then also be the start date for serving his assault sentence. *Id*. The board denied relief. *Id*. It took the position that the board

was entitled to conduct an exit interview before releasing the petitioner and that the petitioner was not entitled to earned-time credit until the board set his firm release date at the exit interview, making the exit interview date the earliest possible release date. *Id.*

On judicial review, we reversed the board's order. We agreed with the board that, under *State ex rel Engweiler v. Cook*, 340 Or 373, 383, 133 P3d 904 (2006), DOC could not calculate earned-time credits until the board converted the petitioner's aggravated-murder sentence to life with the possibility of parole and set a projected release date. *Lehman*, 333 Or App at 421. We also agreed with the board that, under *Janowski/Fleming v. Board of Parole*, 349 Or 432, 459, 245 P3d 1270 (2010), the board was not statutorily required to *physically* release the petitioner before it had the opportunity to conduct an exit interview. *Lehman*, 333 Or App at 423-24. However, we explained that the board had not identified any legal constraint on its ability to retroactively adjust petitioner's release date to account for his earned-time credits, so as to allow him to begin serving his assault sentence earlier. *Id.* at 424. We concluded that existing case law did "not limit the board's authority to 'schedule' petitioner's release date" and that the board had erred in concluding otherwise. *Id.* at 423. We remanded for reconsideration of the board's order. *Id.* at 424.

At first blush, *Lehman* would seem to control this case.[5] Upon closer scrutiny, however, we conclude that it does not, because petitioner did not seek judicial review of BAF 3, only BAF 2. Again, petitioner raises two alternative theories as to how earned time should have been calculated once the board converted her sentence to life with the possibility of parole in BAF 2. But under either of her proposed theories

---

[5] We note that petitioner has identified a potential inconsistency in our post-*Lehman* decisions, in that our nonprecedential memorandum opinion in *Barrett v. Board of Parole*, 336 Or App 215 (2024), *rev allowed*, 373 Or 736 (2025), does not mention *Lehman* and, in petitioner's view, is inconsistent with it. Because *Barrett* is a nonprecedential decision, there is no inconsistency in the actual law—*see* ORAP 10.30(1)(c) ("Nonprecedential memorandum opinions are not precedent and are not binding authority except as relevant under the law of the case doctrine or the rules of claim preclusion or issue preclusion.")—and we decline to comment on *Barrett* given that the Supreme Court recently granted review of that decision.

and under the reasoning of *Lehman*, the issuance of BAF 2 was what triggered DOC's ability to calculate petitioner's earned-time credits, and BAF 3 was the order in which the board decided how to apply petitioner's earned-time credits in setting her firm release date. Therefore, any misapplication of petitioner's earned-time credits occurred in BAF 3, not BAF 2. And petitioner has not sought review of BAF 3, nor of any DOC order. Although it is an unsatisfying result in a case that bears such obvious similarity to *Lehman*, we cannot reverse BAF 3 or any unspecified DOC order, when those orders are not on review, and the error alleged by petitioner simply does not exist in BAF 2, the order that is on review. For that reason, we reject petitioner's challenge to the board's calculation of her release date without reaching the merits.

We affirm the order on judicial review in case number A177739.

## III.   DENIAL OF PETITION FOR HABEAS CORPUS

We next consider petitioner's challenge to the circuit court judgment denying her petition for a writ of habeas corpus.

On March 11, 2022, about two months after completing her aggravated-murder sentence (per the board's release date), petitioner filed a petition for a writ of habeas corpus in Washington County Circuit Court. Petitioner alleged that, due to the misapplication of earned-time credits for her aggravated-murder sentence, DOC was using the wrong start date for her theft sentences and, thus, continued to imprison her at a time when she should have already been released.

The superintendent moved to deny the petition for failure to state a claim on which relief could be granted. The superintendent argued (1) that the board, not DOC, sets the release date for an aggravated-murder sentence; (2) that DOC's earned-time calculations do not themselves result in release but, instead, are properly used by the board to set the exit interview date; and (3) that even if DOC had authority to release a person serving an aggravated murder sentence, it could not do so before the exit interview took

place. The court held a hearing and then denied the petition, incorporating by reference the superintendent's argument that it was the board's responsibility to set the release date and that DOC lacked authority to vary the date set by the board.

Petitioner challenges that ruling, which we review for legal error. *Dunn v. Hill*, 211 Or App 590, 597, 156 P3d 72 (2007). The crux of petitioner's argument is that, as soon as the board set her prison term, DOC was required to calculate and implement her earned-time credits by setting March 28, 2017, as the end date for her aggravated-murder sentence, irrespective of the release date set by the board.[6] She acknowledges that under ORS 163.105 (1995), which governs aggravated-murder sentences, and ORS 144.125 (1995), which provides for an exit interview, the board has the "responsibility for making release decisions," but she argues "that is not the same as the duty to properly calculate and apply the individual's incarceration terms," a responsibility that she views as lying with DOC under ORS 137.320(3), ORS 137.370, and ORS 421.121.[7] As we understand it, petitioner views the board as responsible for determining a person's physical release date from prison and DOC as responsible for determining the legal end date of a prison term.

Petitioner's conceptualization of the division of authority between the board and DOC is facially plausible. *Lehman* recognizes that an individual's physical and legal release dates on an aggravated-murder sentence may not

---

[6] Although petitioner argued in her challenge to ARR 2 (discussed above) that the legal effect of the board converting her life sentence to life with the possibility of parole was to convert her sentence to a 30-year determinate sentence, she does not make that argument in the context of her habeas appeal. Instead, she operates on the assumption that DOC properly calculated her earned-time adjusted release date as March 28, 2017, based on the board's 309-month prison term. Her argument is only that DOC, rather than the board, had the legal authority and duty to effectuate its adjusted release date.

[7] ORS 137.320(3) provides, in relevant part, that "[DOC] shall establish a case file and compute the defendant's sentence in accordance with the provisions of ORS 137.370." ORS 137.370 governs the extent to with DOC shall credit time spent in pre- and post-sentencing custody towards particular sentences and the circumstances in which time spent in custody on one criminal charge can be credited towards the incarceration term for another criminal charge. ORS 421.121 provides for earned-time credits.

always align, and we are unaware of anything that would preclude the legislature from dividing responsibility in the way that petitioner proposes. We are ultimately unpersuaded, however, that the legislature has in fact created such a division of responsibility.

ORS 163.105 (1995) and ORS 144.125 (1995) squarely place upon the board the authority to determine a person's prison term and release date for aggravated murder. *See Engweiler*, 340 Or at 383 (explaining that, as to aggravated murder, "the board is responsible for determining the actual duration of * * * imprisonment"); *Forbus v. Board of Parole*, 309 Or App 296, 302, 482 P3d 95 (2021) ("The board then is required to * * * set the offender's prison term and initial date of release on parole under the matrix rules."); OAR 255-032-0037 (requiring the board to "establish the prison term" following the conversion of a lifetime prison sentence to a sentence of life with the possibility of parole). And, although petitioner is correct that ORS 137.320(3), ORS 137.370, and ORS 421.121 require DOC to properly calculate how much time a person has served in prison on a given sentence and their earned-time credits, those statutes do not authorize DOC to effectuate a release date for an indeterminate prison sentence independently of the board. *Cf. Engweiler v. Persson*, 354 Or 549, 551, 316 P3d 264 (2013) (rejecting the petitioner's argument that DOC was required to release him immediately to give effect to his earned-time credit on an aggravated-murder sentence, because the board had not yet held an exit interview).

The division of responsibility is also reflected in OAR 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(1)(d), which addresses life sentences for murder and aggravated murder otherwise eligible for earned-time credits. It provides that, once the board sets an initial prison term, DOC must calculate the person's earned-time credits and transmit that information to the board. Specifically, OAR 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(1)(d)(A) requires DOC to "provide the calculated earned date to the [board] only after the initial prison term has been established[,]" and OAR 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(1)(d)(B) provides that DOC's "calculation of earned time on the initial prison term will not generate either a 'parole release date' or a 'projected earned time

release date' on the life sentence as the parole release date is still determined by the [board]." Then, the board must use that information to implement the credits as required by law.

We acknowledge petitioner's frustration in trying to pin down who is responsible for what with respect to earned-time credits, particularly given the board's rationale for denying relief in BAF 2—that petitioner's complaint was really directed to DOC actions—while DOC pointed her back to the board in denying her parallel DOC grievance. We hope that, in cases where a person sentenced for aggravated murder is eligible for earned-time credits, this opinion may clarify any uncertainty as to the division of responsibility. In short, as explained above, the board has statutory authority to convert an indeterminate life sentence to a sentence of life with the possibility of release and to set a prison term. Once that occurs, DOC must calculate the person's earned-time credits and transmit that information to the board. Then, with that information in hand, the board must adjust the projected release date to reflect earned-time credits.

Because it was the board's responsibility to set petitioner's release date on her aggravated-murder sentence, and because DOC lacked authority to disregard the release date set by the board, the trial court did not err in denying petitioner's habeas corpus petition. We therefore affirm the judgment on appeal in case number A178929.

## IV. RELEASE TO PAROLE OR PPS

We lastly address petitioner's challenge to the board's order releasing her to parole rather than PPS. When petitioner was originally sentenced for aggravated murder, the court imposed "a period of *post-prison supervision* for the remainder of her natural life." (Emphasis added.) The board nevertheless released petitioner to parole, reasoning that "[a]n offender convicted of aggravated murder is subject to parole release conditions and supervision, without regard to crime commission date." It rejected petitioner's "contrary argument that the Sentencing Guidelines, or the sentencing court's purported application of the Sentencing Guidelines,

divest the Board of its statutory authority to authorize your release on parole." The board took the view that aggravated-murder sentences are not subject to Oregon's sentencing guidelines, and it relied on Oregon Laws 1989, chapter 790, section 28, as authority that aggravated-murder sentences remain subject to the parole system regardless of when the crime was committed.

The parties' dispute boils down to two different views of how sentencing works for aggravated murders committed after November 1, 1989. On the one hand, aggravated-murder sentences are governed by ORS 163.105, which provides for a death sentence or an indeterminate life sentence, which petitioner acknowledges means that they are not subject to the typical sentencing-guidelines procedures whereby a presumptive determinate incarceration term is dictated by the sentencing guidelines grid. She argues, however, that, like all crimes committed after November 1989, sentences for aggravated murders still fall under the greater umbrella of what we will call the "sentencing guidelines system." That is, she argues that, to the extent that ORS 163.105 does not specifically overrule the normal operation of the sentencing guidelines system, the rules of that system still control—and, because ORS 163.105 does not specifically dictate release to parole, the rules of the sentencing guidelines system control and mandate release to PPS.[8]

Respondents disagree. Relying chiefly on Oregon Laws 1989, chapter 790, section 28, they argue that all aggravated murder sentences remain subject to the "parole matrix system" that preceded the sentencing guidelines system, regardless of the date the crime was committed, and that the parole matrix system requires release to parole.

The resolution of the parties' dispute thus turns on whether sentences for aggravated murders committed after November 1, 1989, fall under the umbrella of the sentencing guidelines system or the parole matrix system. Because the issue before us concerns the proper construction of applicable

---

[8] Petitioner also argues that releasing her to parole supervision would violate the *ex post facto* principles of the state and federal constitutions. Because we ultimately agree with petitioner's subconstitutional arguments, we do not reach her constitutional one.

statutes and rules, we review the board's decision for legal error. *Kragt v. Board of Parole*, 373 Or 191, 197, 563 P3d 359 (2025); ORS 144.335(3) (judicial review of a board decision is subject to ORS 183.482(8)); ORS 183.482(8)(a) (legal determinations are reviewed for errors of law).

At the outset, we acknowledge that the issue presented is a difficult one. Relying on the law in effect at the time of petitioner's crime, *Barrett*, 332 Or App at 465 n 1, each of the parties makes compelling arguments for their position. And even after a thorough analysis of the applicable rules and statutes, we admit that there remain questions that cannot easily be answered. Yet, on the whole, we conclude that petitioner has the better argument and that sentences for post-1989 aggravated murders are under the umbrella of the sentencing guidelines system and, consequently, that petitioner should have been released to PPS. To explain our conclusion, we summarize the parole matrix and sentencing guideline systems, examine ORS 163.105 (the aggravated-murder sentencing statute), discuss the rules of the sentencing guidelines system that explicitly apply to aggravated-murder sentences, and then embark on a detailed examination of Oregon Laws 1989, chapter 790, section 28, the statute on which respondents' argument chiefly relies.

A.  *Overview of the Parole-Matrix and Sentencing-Guidelines Systems*

Prior to 1989, Oregon used the parole matrix system to determine the length of a person's incarceration term for a felony conviction. Under that system, the sentencing court would impose a maximum term of incarceration (and sometimes a minimum term of incarceration), but the board would use a matrix that dictated the actual length of the person's prison term. *Engweiler v. Board of Parole*, 343 Or 536, 540, 175 P3d 408 (2007). Sentences imposed under the parole matrix system were "indeterminate," in that the precise length of the prison term was undefined until set by the board. *See* ORS 137.120(1) (defining "indeterminate sentence" to be one in which the sentencing court sentenced a person to "imprisonment for an indeterminate period of time, but stat[ed] and fix[ed] in the judgment and sentence

a maximum term"). After serving the prison term set by the board, the person would be released on parole and, absent revocation, remain on parole under board supervision until the end of the maximum term of incarceration imposed in the judgment. *Campbell v. State of Oregon*, 254 Or App 726, 730, 297 P3d 489, *rev den*, 353 Or 747 (2013).

Effective November 1, 1989, Oregon Laws 1989, chapter 790, replaced the parole matrix system with the sentencing guidelines system. Under the sentencing guidelines system, trial courts are "charged with imposing a determinate sentence for most felony convictions." *Engweiler*, 343 Or at 540. The determinate sentence "is based on a presumptive term determined pursuant to a set of legislatively approved guidelines, from which a sentencing court has limited discretion to deviate. The inmate then serves the sentence that the trial court imposes, without eligibility for release on parole." *Id*. at 540-41. The sentencing guidelines system "eliminated any kind of release on parole for persons subject to its provisions." *Id*. at 541. Instead, upon release, a person serves a term of PPS. OAR 213-005-0002.

As a general rule, crimes committed prior to November 1989 are subject to the parole matrix system (with its indeterminate sentences and release on parole), while crimes committed after that date are subject to the sentencing guidelines system (with its determinate sentences and release to PPS). "[F]or felonies committed on or after November 1, 1989," a sentencing court must "pass sentence * * * in accordance with rules of the Oregon Criminal Justice Commission [(*i.e.*, the sentencing guidelines)] unless otherwise specifically provided by law." ORS 137.010(1). And the board's authority to release individuals on parole is generally limited to crimes committed prior to November 1, 1989. *See* ORS 144.050 ("Subject to applicable laws, the [board] may authorize any adult in custody, who is committed to the legal and physical custody of the Department of Corrections for an offense committed prior to November 1, 1989, to go upon parole subject to being arrested and detained under written order of the board or as provided in ORS 144.350. The [board] may establish rules applicable to parole.").

If that were the end of the story, the answer to the question presented in this case would be clear—but it is not, because aggravated-murder sentences are subject to some special rules, which we discuss next.

B.  *ORS 163.105, the Statute that Governs Aggravated-Murder Sentencing*

ORS 163.105 (1995) governed sentencing for aggravated murder at the time of petitioner's crime.[9] Aggravated murder remained subject to indeterminate sentencing, as it still does today, with three possible sentences available: death, life imprisonment without the possibility of parole or work release, or life imprisonment. ORS 163.105(1) (1995); *State v. Ambill*, 282 Or App 821, 828, 385 P3d 1110 (2016), *rev den*, 361 Or 821 (2016), and *rev den*, 361 Or 524 (2017) (describing life sentences as "indeterminate" sentences). A court sentencing a defendant to the third option was required to "order that the defendant *** be confined for a minimum of 30 years without possibility of parole, release on work release or any form of temporary leave or employment at a forest or work camp." ORS 163.105(1)(c) (1995). Then, once the person has served 25 years in prison, the board is to hold a murder-review hearing to determine whether the person is likely to be rehabilitated in a reasonable time. ORS 163.105(2) (1995). If so, the board must enter an order "convert[ing] the terms of the prisoner's confinement to life imprisonment with the possibility of parole or work release." ORS 163.105(3) (1995). That, in turn, allows for the possibility of future release from prison.

Notably, ORS 163.105 contains no explicit provision for how the board should calculate the length of a person's prison term once their sentence is converted to life with the possibility of release. But, in *Janowski/Fleming*, the Supreme Court held that the legislature intended the parole matrix rules in effect at the time of the crime to be used for that purpose, because there was no "alternative to the matrix system to set parole release dates for prisoners whose terms of confinement were converted to life in prison

---

[9]  ORS 163.105 has been amended numerous times since 1995, but it remains largely the same with regard to the issue on appeal, save for an amendment in 1999 that we discuss more below.

with the possibility of parole." 349 Or at 452-53. Thus, ORS 163.105 implicitly integrated into its operation the parole matrix rules *for determining the length of prison terms*. The legislature has never amended ORS 163.105 to provide an alternative means for determining the length of an indeterminate prison term; therefore, that purpose-specific integration of the matrix rules into ORS 163.105's operation remains a reality today—and is how the board determined petitioner's prison term, as described earlier. That does not answer the question, however, whether a person who finishes serving the prison term so set should be released onto parole or PPS.

The board argues that the very text of ORS 163.105 (1995) precludes the possibility that persons convicted of aggravated murder can be released on PPS, by referring only to the possibility of "parole" or "work release." Petitioner counters that the omission was simply an oversight—indeed, one that the legislature fixed in 1999 by amending ORS 163.105(3) to provide:

> "If, upon hearing all of the evidence, the board * * * finds that the prisoner is capable of rehabilitation and that the terms of the prisoner's confinement should be changed to life imprisonment with the possibility of parole, *release to post-prison supervision* or work release, it shall enter an order to that effect and the order shall convert the terms of the prisoner's confinement to life imprisonment with the possibility of parole, *release to post-prison supervision* or work release *and may set a release date*. Otherwise the board shall deny the relief sought in the petition."

Or Laws 1999, ch 782, § 5 (symbols replaced with italicization to show added language). Interestingly, that amendment was proposed by Diane Rea, chairperson of the board. Exhibit A, House Committee on Judiciary, Subcommittee on Criminal Law, HB 3586, Apr 30, 1999 (accompanying statement of Board Chairperson Diane Rea). Rea explained that the amendment was necessary because "offenders who commit their [aggravated murder] crime after 11/1/89 do not go out on parole, *they go out on post-prison supervision*." *Id.* (emphasis added).

In petitioner's view, the amendment was clearly intended to correct an oversight. Moreover, petitioner argues,

only her interpretation gives effect to the amendment. If all aggravated-murder sentences are wholly outside the sentencing guidelines system, such that anyone convicted of aggravated murder regardless of commission date must be released onto parole—as the board now contends, contrary to its chairperson's position in 1999—the 1999 amendment to add the "release to post-prison supervision" language to ORS 163.105(3) was meaningless.

Petitioner's argument regarding the 1999 amendment is persuasive. Having reviewed all of the amendments to ORS 163.105 since 1989, we have found no indication that the 1999 amendment was intended as anything other than a fix that would apply to all life sentences for aggravated murder committed after November 1989. In other words, like petitioner, we can divine no purpose for the amendment other than to fix an errant omission from the statute, which serves that purpose only if persons convicted of aggravated murder after 1989 are subject to release on post-prison supervision in the event that their life sentences are converted to life with the possibility of release.

C.  *Aggravated-Murder Sentencing Rules in the Sentencing Guidelines System*

We next examine the rules that were developed by the Oregon Criminal Justice Council (OCJC), promulgated by the Oregon Sentencing Guidelines Board (OSGB) in 1988, and approved by the legislature in Oregon Laws 1989, chapter 790. *See State v. Norris*, 188 Or App 318, 321, 72 P3d 103, *rev den*, 336 Or 126 (2003) (summarizing the development of the guidelines system). We look to those rules for two reasons. First, the OCJC was tasked with creating the rules to implement the sentencing guidelines system, and the OSGB adopted those rules and provided commentary for their implementation, so the manner in which those rules were intended to apply to aggravated murder sentencing is persuasive evidence of both the intended reach of the sentencing guidelines system and its intended functioning. Second, that the legislature expressly approved of those rules, giving them the force of statute, suggests that the legislature agreed with the intended reach and operation of the sentencing guidelines system as reflected in the rules. On

that point, it is notable that, when the legislature wanted to amend the OSGB's rules, it said so explicitly. *See, e.g.*, Or Laws 1989, ch 790, §§ 96, 98, 101 (requiring the OSGB to amend particular rules in the manner dictated by the legislature).

We first consider *former* OAR 253-09-001(1) (Sept 1, 1989), *renumbered as* OAR 213-009-0001(1) (Mar 8, 1996), which provides, "If a mandatory prison sentence is required or authorized by statute, the sentence imposed shall be that determinate sentence or the sentence under these rules whichever is longer." *See also* ORS 137.637 (1995) ("When a determinate sentence of imprisonment is required or authorized by statute, the sentence imposed shall be the determinate sentence or the sentence as provided by the rules of the Oregon Criminal Justice Commission, whichever is longer."). Notably, the rule does not mention *indeterminate* sentences, which could mean that is it not meant to encompass aggravated-murder sentences, even though the rule plainly contemplates the existence of statutory sentencing requirements external to the sentencing guidelines that nonetheless produce sentences subject to the larger sentencing guidelines system.

There is compelling evidence, however, that the omission was not intended to keep aggravated-murder sentences wholly in the realm of the parole matrix system. The OCJC's commentary to *former* OAR 253-05-004 (Sept 1, 1989), *renumbered as* OAR 213-005-0004 (Mar 8, 1996)—a rule that we discuss in more detail below—explains that "[e]xisting statutory law permits the imposition of an indeterminate life sentence with a mandatory minimum term" for murder and aggravated murder, but that "such an indeterminate sentence" is "permitted by OAR 253-09-001(1)." *Oregon Sentencing Guidelines Implementation Manual* 93 (1989) (*Implementation Manual*). Thus, despite failing to explicitly mention statutorily required *indeterminate* sentences, it appears that the OCJC intended the sentencing guidelines system to accommodate the aggravated-murder sentencing scheme, that is, that it understood that aggravated-murder sentences could still fall under the umbrella of the sentencing guidelines system despite ORS

163.105 overriding many of the system's default rules. And, certainly, neither *former* OAR 253-09-001(1) (Sept 1, 1989) nor ORS 137.637 (1995) foreclosed that intended operation.

Returning to *former* OAR 253-05-004 (Sept 1, 1989), it provides the strongest support for petitioner's position because it *explicitly* provides for a person in petitioner's position to be released to PPS:

"(1)   The term of *post-prison supervision* for an offender serving a life sentence pursuant to ORS 163.105 [(aggravated murder)] or ORS 163.115 [(murder)] shall be for the remainder of the offender's life, unless the Board finds a shorter term appropriate. In no case shall the term of supervision be less than three years.

"(2)   The limit on sanctions for post-prison supervision violations provided in OAR 253-11-004(3) shall not apply to offenders on post-prison supervision as provided by this rule."

(Emphasis added.) The commentary in the Implementation Manual explains:

"This rule is intended to avoid any conflict with current law as to the supervision of persons convicted of aggravated murder or murder/felony murder. *** *If such an offender has been sentenced for a crime committed on or after November 1, 1989, the offender will be released to post-prison supervision.* This rule describes how post-prison supervision shall be administered for offenders serving indeterminate life sentences."

*Implementation Manual* at 93 (emphasis added). Because *former* OAR 253-05-004 (1989) was approved by the legislature, as previously discussed, it has the force of statute. *State v. Kragt*, 368 Or 577, 581, 495 P3d 1233 (2021).

D.   *Oregon Laws 1989, chapter 790, section 28*

We next consider Oregon Laws 1989, chapter 790, section 28, which is the strongest authority for the board's position.

As previously mentioned, Oregon Laws 1989, chapter 790, is "the comprehensive legislation implementing the sentencing guidelines" system and expressly approving of

the OSGB's rules implementing that system. *State v. Davis*, 315 Or 484, 490, 847 P2d 834 (1993); Or Laws 1989, ch 790, § 87 ("The Sixty-fifth Legislative Assembly approves the sentencing guidelines as developed by the State Sentencing Guidelines Board \*\*\*."). It is also the legislative act that amended ORS 137.010(1) to mandate the application of the sentencing guidelines system to all "felonies committed on or after November 1, 1989," and that amended ORS 144.050 to restrict the board's parole authority to "offense[s] committed prior to November 1, 1989." Or Laws 1989, ch 790, §§ 6, 25. As such, we presume that the legislature intended section 28 to work in harmony with the other provisions of chapter 790 and the rules that it expressly approved. *See Montara Owners Assn. v. La Noue Development, LLC*, 357 Or 333, 340, 353 P3d 563 (2015) ("Where parts of a statute conflict, we attempt to harmonize them in a way that gives effect to both.").

Section 28, which is compiled as a note after ORS 144.110, provides that 11 parole-related statutes continue to apply to offenders convicted of a crime committed prior to November 1, 1989, or convicted of aggravated murder committed on any date:

> "The provisions of ORS 144.110, 144.120, 144.122, 144.125, 144.130, 144.135, 144.185, 144.223, 144.245, 144.270 and 144.305 apply only to offenders convicted of a crime committed prior to November 1, 1989, *and to offenders convicted of aggravated murder regardless of the date of the crime.*"

(Emphasis added.)

The cited statutes are complex and lengthy, but they cover matters such as prohibiting the board from releasing an aggravated murderer on parole "except as provided in ORS 163.105," ORS 144.110 (1995)[10]; allowing the board to hold an exit interview to determine whether there are grounds to postpone a person's scheduled parole release, ORS 144.125 (1995); requiring the board to allow a prisoner access to written materials that the board will consider with

---

[10] ORS 144.110 has been amended numerous times since 1995. *See* Or Laws 1999, ch 782, § 1; Or Laws 2001, ch 104, § 47; Or Laws 2007, ch 717, § 3; Or Laws 2015, ch 820, § 43; Or Laws 2019, ch 635, § 14.

respect to release on parole, ORS 144.130 (1995), *amended by* Or Laws 1997, ch 825, § 2; requiring the board to state in writing the basis of its decision after an exit interview, ORS 144.135 (1995); allowing the board to consider various documents and information, including the prisoner's parole plan, in connection with an exit interview, ORS 144.185 (1995), *amended by* Or Laws 2019, ch 634, § 26, ORS 144.223 (1995); requiring the board to release a prisoner onto parole on the set date, unless the prisoner has a consecutive sentence to serve, ORS 144.245 (1995); and authorizing the board to specify and modify parole conditions for a person released on parole, ORS 144.270 (1995).[11]

The board argues that section 28 evinces the legislature's intent to keep aggravated-murder sentences entirely within the parole matrix system. Although that argument obviously has some force, we are ultimately unpersuaded, because we view section 28 as being susceptible to two different constructions, only one of which harmonizes it with the other statutes and rules already discussed. One construction is that urged by respondents, under which people convicted of aggravated murder are subject to exactly the same parole matrix system that existed for all offenders prior to November 1, 1989. The alternative construction, which we ultimately conclude is more likely what the legislature intended, is that section 28 *excludes* application of the cited statutes to anyone other than offenders who committed their crimes before the cut-off date in 1989 or who committed aggravated murder, without meaning to comment on the particulars of how those statutes apply to the offenders to whom they can be applied.

Before engaging in the statutory analysis that leads us to that conclusion, we pause to acknowledge that there is dicta in existing case law that is premised on the first construction. *See, e.g.*, *Forbus*, 309 Or App at 305 n 4 (stating that, under section 28, "the board retains authority to parole

---

[11] ORS 144.270 has been amended numerous times since 1995. *See* Or Laws 1999, ch 239, § 3; Or Laws 1999, ch 626, § 13; Or Laws 2001, ch 731, §§ 3, 4; Or Laws 2005, ch 532, § 2; Or Laws 2005, ch 567, § 10; Or Laws 2005, ch 576, § 3; Or Laws 2005, ch 642, § 3a; Or Laws 2007, ch 71, § 38; Or Laws 2009, ch 595, § 100; Or Laws 2009, ch 204, § 7; Or Laws 2009, ch 713, § 13; Or Laws 2011, ch 258, § 2; Or Laws 2011, ch 547, § 31; Or Laws 2019, ch 213, § 30.

aggravated murderers"); *State ex rel Engweiler v. Cook*, 197 Or App 32, 34, 103 P3d 1205 (2005), *aff'd on other grounds*, 340 Or 373, 133 P3d 904 (2006) (describing section 28 as "providing for parole of incarcerated inmates *** convicted of aggravated murder regardless of the date of the crime" (internal quotation marks omitted)); *State v. McLain*, 158 Or App 419, 425, 974 P2d 727 (1999) (citing section 28 to mean that "the [b]oard has authority to parole offenders who are serving indeterminate sentences for pre-1989 crimes and to parole aggravated murderers"). We are hesitant to disregard such repeated statements, but, ultimately, those statements are dicta. *See State v. Guzman*, 366 Or 18, 28, 455 P3d 485 (2019) (defining dictum as "a statement that is not necessary to the court's decision" (internal quotation marks omitted)). For example, in *Forbus*, where we said that, under section 28, "the board retains authority to parole aggravated murderers," the actual issue to be decided was whether the board erred by applying matrix rules that were not in effect at the time of the petitioner's crime to determine the length of his prison term. 309 Or App at 296 n 4, 298. In answering that question, we held that "the matrix system applies to the determination of this petitioner's prison term, even though he committed his offense in 1994, after the Oregon Sentencing Guidelines went into effect."[12] *Id.* at 306. But we were not called upon to determine whether the petitioner should have ultimately been released on PPS or parole.

That dicta aside, neither we nor the Supreme Court has ever actually engaged in statutory construction of section 28. Not surprisingly then, neither we nor the Supreme Court has ever done a fulsome analysis—or any analysis, beyond a cursory reading of the text of section 28—as to how that statutory provision interrelates with other statutory provisions as relevant to the question whether a person sentenced to an indeterminate life sentence for an aggravated murder committed after November 1, 1989, whose sentence is later converted, should be released on parole or PPS. The only time that we or the Supreme Court has

---

[12] That holding is untouched by this decision because, as *Janowski/Fleming* recognized, ORS 163.105 integrated the parole matrix rules into its operation for the purpose of determining the length of prison terms for converted life sentences.

addressed whether a specific person convicted of aggravated murder should be released to parole or PPS is in two of the *Engweiler* cases.

In an *Engweiler* case decided in 2013, the plaintiff argued that he was eligible for immediate release to PPS, given his earned-time credits, and was not required to go through an exit interview. 354 Or at 554, 566. The Supreme Court rejected his argument about the exit interview—a result that aligns with our own analysis of the statutes herein. *Compare* 341 Or App at 536 (recognizing that "ORS 144.125 (1995) squarely place upon the board the authority to determine a person's prison term and release date for aggravated murder"), *with Engweiler*, 354 Or at 566-68 (holding that, in Oregon Laws 1989, chapter 790, section 28, the legislature expressly made aggravated-murder sentences subject to the exit-interview procedure described in ORS 144.125). As for the plaintiff's contention that he should be released on PPS, the court summarily rejected that argument—not based on a statutory analysis, but simply because the plaintiff had "offered no persuasive analysis" as to why the court should not follow its summary statement in earlier opinions in his case that his "entitlement, if any, to eventual release will be to parole." *Id.* at 566-67; *see generally Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700, 64 P3d 1193 (2003), *adh'd to as clarified on recons*, 187 Or App 472, 68 P3d 259 (2003) (explaining that it is not an appellate court's "proper function to make or develop a party's argument when that party has not endeavored to do so itself"). When the plaintiff tried to renew his PPS argument before us in *Engweiler v. Board of Parole*, 291 Or App 355, 421 P3d 424, *rev den*, 363 Or 599 (2018), we viewed the Supreme Court's past statements in prior appeals by the same plaintiff as controlling. *Id.* at 357 ("Given the Supreme Court's explicit statement that petitioner's 'entitlement, if any, to eventual release will be to parole,' we reject petitioner's assertion that the Supreme Court's statements on the matter do not control. Rather, we are bound by the Supreme Court's decision on the matter until such time as that court disavows it.").

Ultimately, the issue before us is sufficiently complex that we feel obliged to meaningfully engage in the

necessary statutory construction, rather than simply defer to dicta that, on its face, provides an easy answer, but which clearly was not the result of actual statutory analysis (because none was called for). And the parties have squarely raised and briefed the statutory construction issue.

We start with the text of section 28 and specifically the phrase "[t]he provisions * * * apply only to." The use of the word "only" suggests that the legislature was thinking in terms of exclusion—removing everything else from the application of those statutes—which at least slightly favors construing section 28 as excluding any application of the cited statutes to offenders other than those identified, without meaning to provide anything as to how those statutes will be applied to the offenders to which they can be applied. For example, by its express terms, the current version of ORS 144.120 does not apply to offenders sentenced for aggravated murder, so, even though section 28 allows for ORS 144.120 to be applied to "offenders convicted of aggravated murder regardless of the date of the crime," it does not in fact apply to them.

The legislative history also supports our reading of section 28. As originally drafted, section 28 provided for ongoing application of the cited statutes only to offenses committed before the sentencing guidelines system went into effect:

> "The provisions of [ORS] 144.110, 144.120, 144.122, 144.123, 144.125, 144.130, 144.135, 144.140, 144.185, 144.223, 144.245, 144.270, 144.275 and 144.305 apply only to offenses committed prior to September 1, 1989."

Senate Bill (SB) 1073, § 28, A-Engrossed (1989). The OCJC suggested amending it to include aggravated murder in response a request from the board. Exhibit A, Senate Judiciary Committee, SB 1073, May 5, 1989 (recommended amendments to SB 1073 A-Engrossed). As we explain more later, it appears that the board had realized that, because people convicted of aggravated murder would continue to receive indeterminate life sentences, the board needed to keep mechanisms in place to determine whether and when to release such offenders from prison, and none existed in the new legislation, which was all built around determinate sentences.

As described by the OCJC, amended section 28 "[l]imits the statutory provisions related to *the determination of parole release dates* to offenders convicted of aggravated murder or crimes committed prior to November 1, 1989." Exhibit D, House Committee on the Judiciary, Subcommittee on Crime and Corrections, SB 1073, June 15, 1989 (bill summary prepared by the OCJC) (emphasis added). Elsewhere, it explained that the amendment "recognizes that the current parole function will be retained for offenders convicted of Aggravated Murder which is excluded from the guidelines system." Exhibit A, Senate Committee on Judiciary, SB 1073, May 5, 1989 (recommended amendments to SB 1073 A-Engrossed).

While the first statement focuses on the release *date*, the second statement refers to the parole *function* more generally, which would seem to support the board's current position. However, given the larger context, we are doubtful that the OCJC intended its statements to be understood as going beyond addressing the issue identified by the board— that, without keeping the parole-release related statutes in place for offenders convicted of aggravated murder, there would be no mechanisms to decide whether and when to release them from prison. What ultimately drives us to that conclusion is that OCJC is the body that recommended *former* OAR 253-05-004 (Sept 1, 1989), the rule requiring lifetime PPS for aggravated murder sentences, and that its own Implementation Manual, which post-dates the amendment to section 28, continues to specify that persons sentenced for post-1989 aggravated murders will be released on PPS. There is simply no other way to reconcile the various provisions. There is also no indication that section 28 was intended to upend the default rule that crimes committed after November 1, 1989, are subject to the sentencing guidelines system. *See* ORS 137.010 (so providing).

As for *how* the cited parole-related statutes were intended to apply to offenders convicted of aggravated murder after November 1, 1989, we acknowledge that the absence of any mention of PPS in those statutes is a complicating factor in the analysis. There is at least superficial tension between *former* OAR 253-05-004 (Sept 1, 1989),

which explicitly provides for aggravated murderers released from prison to be released on PPS, and section 28, which allows those same individuals to be subject to statutes that were enacted before PPS came into existence, that refer only to parole, and that have never been amended to refer to PPS. Most of those statutes address procedures when someone is being considered for release and, although they refer to parole, are not unique to parole such that there would be any difficulty applying them to someone being considered for release on PPS if that is what the legislature intended (as we believe it was).[13] The one exception is ORS 144.270, which governs the conditions of parole. That statute cannot be applied to a person released to PPS because the conditions of PPS are governed by a separate statute, ORS 144.102. However, as we have already explained, we do not understand section 28 to mean that every single statute cited therein must be applied to every single person covered by section 28. Just as ORS 144.120 is listed in section 28 but does not currently apply to aggravated murders, ORS 144.270 is listed in section 28 but does not apply to persons released on PPS.

Ultimately, we must harmonize all of the provisions enacted or approved by the legislature if we can, *Montara Owners Assn.*, 357 Or at 340, and there is simply no way to effectuate *former* OAR 253-05-004 (Sept 1, 1989) under the board's reading of section 28, whereas our reading of section 28 harmonizes all of the provisions. We also note that the result would be no different were we to conclude that the

---

[13] *See* ORS 144.110 (explaining that the board cannot release a person convicted of murder except as provided in ORS 163.105); ORS 144.122 (allowing a person to request an earlier release date); ORS 144.125 (providing for exit interviews); ORS 144.130 (requiring a person to have access to written materials prior to hearing before the board); ORS 144.135 (requiring the board to issue its decisions in writing); ORS 144.185 (allowing the board to demand records and information pertinent to the exit interview); ORS 144.223 (allowing the board to require a person to undergo a psychological examination prior to release); ORS 144.245 (requiring that, once the board has set a date for release, "the prisoner shall be released on that date," except in specified circumstances). Although those statutes refer only to release on "parole," we can see no way in which those procedures are incompatible—as a practical matter—with a person being released to PPS. For example, ORS 144.125 provides authority for the board to conduct an exit interview, and it refers to parole. But its requirements and procedures are simply aimed at determining whether there is a basis to defer the release of a person from custody. Nothing about those requirements or procedures necessarily require that the person be released to a particular form of supervision.

legislature simply failed to consider how section 28 would function in relation to the rest of Oregon Laws 1989, chapter 790, because, in that event, our best assessment of the legislative intent on the issue would control and would lead to the same result. *See Angle v. Board of Dentistry*, 294 Or App 470, 479, 431 P3d 447 (2018) ("[W]hen a specific issue is not addressed clearly in a statute or its legislative history, we use the broader purpose of the statute as a guide in our attempt to discern what the legislature would have intended had it considered it." (Internal quotation marks omitted.)).

E.   *Conclusion: Release to PPS*

Accordingly, we conclude that offenders convicted of aggravated murder for crimes committed after November 1, 1989, whose life sentences are converted to life with the possibility of release, are to be released to lifetime PPS, not parole, in the event of release. To summarize our reasoning: ORS 137.010(1) states the general rule that crimes committed after November 1, 1989, are subject to the sentencing guidelines system, and ORS 144.050 limits the board's parole authority to pre-1989 felonies. The sentencing guidelines system allows for specific statutory sentencing schemes to override its general rules while still remaining under the umbrella of the greater sentencing guidelines system. ORS 163.105 is such a statutory override, but it does not override the default rule that a person sentenced for a post-1989 felony is to be released on PPS. OAR 213-005-0004, a rule approved by the legislature, explicitly provides that persons serving an aggravated-murder sentence for a crime committed after November 1989 will serve a lifetime PPS term. And nothing in Oregon Laws 1989, chapter 790, section 28, precludes such a person from being released to PPS; instead, it allows the board to continue using the 11 parole-related statutes, as needed, for the purpose of determining whether and when to release a person from custody.

The board therefore erred in releasing petitioner onto parole instead of PPS.

In Case No. A181213, reversed and remanded. In Case Nos. A177739 and A178929, affirmed.